## COMPTON v. JESUP.

CERTIFICATE FROM THE COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 314. Argued December 4, 1896. — Decided May 10, 1897.

In the course of the various proceedings, referred to in the Statement of the Case, below, for the foreclosure of mortgages in different States upon different railroads which constituted a part of what was known as the Wabash system, and for its reorganization, the claim of the appellant which forms the subject of this appeal was considered. His claim was for equipment bonds for equipment furnished the Ohio division. Among the proceedings was a suit in Indiana, involving the question of the lien of such bonds upon the portion of the road in Indiana, in which it was decreed that there was no lien. The various proceedings resulted on the 23d of March, 1889, in a decree of foreclosure in the several Circuit Courts in Ohio, Indiana and Illinois, by which the entire line was to be sold as a unit, and further it was provided that the rendering of that decree in advance of the trial and determination of the appellant's claim should not affect the rights of the appellant, but that they should be preserved and enforced in the manner provided for by the decree. The sale under the decree was made and confirmed. August 17, 1889, it was ordered "that the issues presented in this cause as to the lien and claim of James Compton, made by the various pleadings herein upon and concerning said claim and lien, and reserved in the former decree herein saving the rights of said Compton, be and the same are hereby referred to Bluford Wilson as special master," etc. The special master

reported that Compton's lien was a valid one, and that he was entitled by the saving clause of the decree to have the Ohio division resold if the purchaser did not pay off his bonds, principal and interest, in full. The Circuit Court sustained the master in holding Compton's lien valid, but decided that his only remedy was to redeem the four divisional mortgages, two in Ohio and two in Indiana. Appeal was taken to the Circuit Court of Appeals. That court, after making a full statement, requested the instructions of this court upon the following questions: First. Had Compton the right under the saving clause of the decree for sale to a decree for the redemption of the Ohio division only? Second. In fixing the amount to be paid in redemption, is he entitled to have the principal and interest of the mortgages to be redeemed reduced by the net earnings received by the purchaser? Third. Is the decree of the Circuit Court of the United States for the District of Indiana between the same parties and unappealed from, *res judicata* upon the foregoing questions in this court? *Held*,

(1) That the decree of sale of March 23, 1889, conferred upon Compton, in event that his claim should not be paid by the purchaser, the right to a decree of resale of the property situated in Ohio and covered and affected by his lien;

(2) That, in event of such sale, and in applying the proceeds thereof, Compton would be entitled to an account of the net earnings of the Ohio division over and above all operating expenses, taxes paid, and cash paid, if any, in redemption of receiver's certificates and other expenses properly chargeable against the Ohio division, which net earnings should be deducted from the amount due on the two prior mortgages on said division;

(3) That the decree rendered in the Circuit Court of the United States for Indiana was not *res judicata* upon the foregoing questions.

THIS case comes to this court on a certificate from the United States Circuit Court of Appeals for the Sixth Circuit, propounding questions concerning which instructions are asked, in accordance with section 6 of the act to establish Circuit Courts of Appeals, approved March 3, 1891.

The statement of facts and questions are as follows:

This is an appeal from that part of a decree in a railroad mortgage foreclosure suit, rendered by the Circuit Court of the United States for the Northern District of Ohio, which fixes the priority of a lien of the appellant and prescribes the remedy for its enforcement. James Compton, the appellant, was a citizen of the District of Columbia. Holding equipment bonds issued by the Toledo and Wabash Railway Company, which subsequently became one of the constituent

companies of the Wabash system, he obtained a decree from the Ohio Supreme Court, declaring them to be a valid lien on that part of the main line of the Wabash system reaching from Toledo west to the Illinois line, and awarding to him, as a means of enforcing the lien, an order for sale of the portion of the line lying in Ohio. 45 Ohio St. 592. Shortly after the entry of this decree by the Ohio Supreme Court and before it was executed, upon the prayer of the complainant and a cross-complainant in the foreclosure proceedings in the court below and after the filing of the necessary affidavit, the court entered an order based on section 8 of the act of Congress of March 3, 1875, directing that Compton be served with subpœna in the District of Columbia, and required to appear and set up his lien in this cause. The order was complied with and Compton, appearing only for the purpose of objecting to the validity of the service, moved the court to set the service aside and to dismiss him from the case. The motion was overruled. He then demurred to the jurisdiction on the ground that citizens of the same State appeared on both sides of the controversy. His demurrer was overruled. The amendments to the bill and cross-bills concerning Compton denied the validity of his lien, and asserted that he was estopped by matter of record to claim a lien because of a decree of the Supreme Court of the United States to which he was in law privy, in the case of *Wabash, St. Louis & Pacific Railway Company* v. *Ham,* denying the existence of a lien in favor of the equipment bondholders. Compton in his answers which he filed after his demurrer was overruled set up his lien as declared by the Ohio Supreme Court decree and his right thereunder to have the Ohio division sold to satisfy it. Compton also claimed in his answer that his bonds were a first lien upon certain terminals of the defendant company at Toledo on the ground that the Ohio divisional mortgage did not cover this property. The court below adjudged that Compton had a valid lien on the Ohio and Indiana lines by virtue of the Ohio decree, but denied his right to a first lien on the Toledo terminals or to a separate sale of the Ohio line, and declined to afford him any relief but that of redeem-

ing the four divisional mortgages, two on the Ohio line and two on the Indiana line, by the payment of about $8,000,000. The sale under the decrees of foreclosure in the court below, against Compton's objection, took place before the validity and character of his lien were determined, and a provision was inserted in the decree saving his rights. Compton contended that the language of this saving clause entitled him to the payment of his lien by the purchaser or in default thereof a resale of the Ohio part of the railroad. At the hearing of the appeal, a motion was made to dismiss on the ground that the same decree as that here appealed from was entered by the United States Circuit Court for Indiana in a case between the same parties.

This appeal presents the questions:

1st. Had the court jurisdiction of the original bill?

2d. Had it power to make Compton party by substituted service?

3d. Was Compton estopped to assert a lien for his bonds by a decree of the United States Circuit Court for Indiana denying it for bonds of the same kind in what was claimed to be a representative suit?

4th. Did the Ohio divisional mortgages not cover certain after-acquired terminal property at Toledo so that Compton had a first lien thereon?

5th. What was the effect of the proviso in the decree of sale upon Compton's rights and remedy?

6th. What relief was he entitled to under the Ohio decree?

7th. Is Compton estopped to prosecute this appeal by the fact that a decree identical in terms with the one here appealed from was entered in the United States Circuit Court for Indiana, and has not been appealed from?

The facts of the case are quite complicated, and many of them must be stated for a clear understanding of the issues.

The Wabash, St. Louis and Pacific Railway Company, usually known as the Wabash system, comprised as its main line, a railroad which ran from Toledo, Ohio, west through Ohio, Indiana, Illinois and Missouri to Kansas City. It was the result of a consolidation of separate railroads, one in Ohio,

one in Indiana, three or four in Illinois and one or more in Missouri. First the Ohio and Indiana companies were consolidated, then the companies east of the Mississippi River, and finally in 1880 all of them were united in the Wabash, St. Louis and Pacific Company. Many of the constituent companies had issued bonds secured by mortgage upon their respective lines, and as consolidations took place the new companies assumed the obligation of the mortgage and bonded debts of their constituents. When the Ohio and Indiana companies were united in 1858 under the name of the Toledo and Wabash Railway Company, there were two mortgages on the Ohio part, one to the Farmers' Loan and Trust Company, trustee, to secure $900,000 of bonds, and a second to E. D. Morgan, trustee, to secure bonds amounting to $1,000,000. There were also two mortgages on the Indiana part, one to the Farmers' Loan and Trust Company, trustees, for $2,500,000, and a second to E. D. Morgan, trustee, for $1,500,000. The Toledo and Wabash Company in 1862 issued equipment bonds to the amount of $600,000, but gave no mortgage to secure them. It is $150,000 — par value — of the equipment bonds which is the subject-matter of this appeal. In 1865 the Toledo and Wabash Railway Company united with several Illinois companies and became the Toledo, Wabash and Western Company, with a line reaching from Toledo to the Mississippi River. It was this consolidation which the Supreme Court of Ohio held, by virtue of the Ohio statute authorizing it, to have the effect of fastening the equipment bonds as a lien on the property of the Toledo and Wabash Railway Company which passed to the new company. The articles of agreement contained the following provisions:

"Now, therefore, the said companies by their respective directors agree to consolidate their said roads, property and capital stock into one company upon the basis and conditions hereinafter specified, to be submitted by the directors of each of said roads, to the stockholders thereof for ratification, to wit:

"The Toledo and Wabash Railway Company enters into said consolidation on the following basis, viz.:

"Its capital is...... : ..............  $10,000,000
    Composed as follows:
  First-mortgage bonds.............  . 3,400,000
  Second-mortgage bonds ..........·  2,500,000
  Convertible equipment bonds .....  600,000
  Convertible preferred stock .......  1,000,000
  Common stock .................  2,500,000

    *      *      *      *      *

"It is further agreed that, on the terms and conditions above specified, the four railroad companies hereto do agree, each for itself severally, that the several companies named shall be and they hereby are consolidated into and form one corporation, etc.

    *      *      *      *      *

"It is further agreed that the bonds and other debts here-inabove specified, in the manner and to the extent specified, and not otherwise provided for in this agreement, shall, as to the principal and interest thereof, as the same shall respectively fall due, be protected by the said consolidated company, according to the true meaning and effect of the instruments or bonds by which such indebtedness of the several consolidating companies may be evidenced."

The new company, the Toledo, Wabash and Western Railway Company, shortly after the consolidation offered a mortgage to Knox and Jesup, trustees, upon its entire road, known as the consolidated mortgage, with the purpose therein recited of using the proceeds of their sale to take up and refund all previous indebtedness, including the equipment bonds. The purpose was never carried out, but some $2,500,000 of bonds were issued and the proceeds expended for the use of the company. In the foreclosure of a subsequent mortgage called the gold-bond mortgage, and the consequent reorganization, the property of the Toledo, Wabash and Western Company passed, subject to all previous mortgages, to a consolidated company of the same three States, called the Wabash Railway Company, which issued bonds amounting to $2,000,000, secured by mortgage on its line to Humphreys and Lindley,

trustees. In the decree for sale and deeds under it it was provided that the sale should be without prejudice to the equipment bondholders' rights which were left open. Then the Wabash Company united with a Missouri company to make the Wabash, St. Louis and Pacific Company a consolidated company of Ohio, Indiana, Illinois and Missouri, with a line of railway extending from Toledo to Kansas City. This company issued bonds amounting to $17,000,000, and secured them by mortgage on its entire line to the Central Trust Company and James Cheney of Indiana as trustees. In 1884 the Wabash, St. Louis and Pacific Railway Company filed a bill in the Circuit Court for the Eastern District of Missouri against the Central Trust Company, a citizen of New York, and James Cheney, a citizen of Indiana, trustee under the last mortgage, averring its insolvency, praying for the appointment of a receiver, the marshalling of liens upon it, the sale of its road and a distribution of proceeds for the benefit of its creditors. A similar bill was filed in the Circuit Courts for the Northern District of Ohio and for other districts. Receivers were appointed, who took possession of the railroad, and operated it. Shortly afterward the Central Trust Company and Cheney filed a bill to foreclose their mortgage in state courts of the several States where the mortgaged property lay. These suits were removed to the proper Federal courts, and were consolidated with the insolvency bills (so called) already referred to. The consolidated causes proceeded to decrees for sale in the various jurisdictions. The property was bid off in each court to James F. Joy and others, a purchasing committee under a plan of reorganization entered into by the foreclosing bondholders. The sales were confirmed and deeds ordered to be executed. The committee took possession from the receivers of the part of the railroad west of the Mississippi River, but for some reason, not clearly disclosed in the record, the court did not order the receivers to deliver possession to the purchasers of the lines east of the Mississippi. The sale of Joy and associates in Ohio was subject to the Humphreys and Lindley mortgage, the Knox and Jesup mortgage, the Compton lien, if any he

had, and the Ohio divisional mortgages. While the railroad in Illinois, Indiana and Ohio was still in the hands of the receivers, Knox and Jesup began the proceeding in which this appeal was taken, by filing a bill against the Wabash, St. Louis and Pacific Railway Company to foreclose their mortgage in the Circuit Courts of northern Ohio, Indiana and Illinois, and for the appointment of receivers, and made parties defendant those holding mortgages on the part of the road within each jurisdiction as well as the purchasing committee at the former sale. Humphreys and Lindley and the Farmers' Loan and Trust Company filed answers, which by stipulation were taken as cross-bills, setting up their mortgage liens on the Ohio property, and praying a foreclosure and sale. The bills and cross-bills all averred that at the time of filing the same the road was in the possession of the receivers appointed by the court below in the previous foreclosure suit. Citizens of the same State appeared on both sides of the controversy thus presented. Compton was made a party in the way already stated both to the Indiana and Ohio bills and cross-bills. The litigation in the courts of the three States proceeded together. Judge Jackson, the Circuit Judge for the Sixth Circuit, and Judge Gresham, the Circuit Judge for the Seventh Circuit, sat together, heard the points in dispute argued and made the same orders in their respective jurisdictions. The pleadings in the court below are quite confusing, and do not seem to have been prepared or filed with much care to keep separate the jurisdictions of the Circuit Courts of the three districts in which the litigation was pending. The amended bill of Knox and Jesup recited that a similar bill had been filed in the Southern District of Illinois, and attached the same as an exhibit. Both bills made parties all persons having or claiming an interest in any part of the line in the three States. Among these defendants were James F. Joy, as substituted trustee under the second Ohio divisional mortgage, and also as substituted trustee under the second Indiana divisional mortgage. The cross-bill of Humphreys and Lindley, trustees under the mortgage issued by the Wabash Railway Company on the entire line east of the Mississippi River, made the

same parties as in the amended bill. The amended cross-bill of the Farmers' Loan and Trust Company, seeking to foreclose that part of the railroad lying in Ohio, only made parties defendant those having a mortgage lien on the Ohio division. Compton was made a party to this cross-bill as was also James F. Joy, as trustee under the second mortgage on the Ohio property. By some error, Joy, as an answer to the amended bill of complaint and the cross-bills of Humphreys and Lindley and of the Farmers' Loan and Trust Company, filed the same answer made by him in the Indiana suit, in which he only set up and asked to be protected in his rights as substituted trustee in the mortgage of the Wabash and Western Railway Company, and made no averment or prayer in regard to the mortgage on the Ohio part of the railroad in which he had also been substituted as trustee in place of E. D. Morgan, trustee. Other answers were filed by parties defendants, and the cause proceeded in the three different courts in Ohio, Indiana and Illinois as if the same questions were pending in each court, and the same issues were raised, without respect to the territorial jurisdiction of each court. Identically the same decree, foreclosing all the mortgages on all the railroad property east of the Mississippi River, divisional and otherwise, was entered in each district. The decree was entered March 23, 1889. Compton was not required to answer the bill and cross-bills until April following, but in fact did answer March 28, 1889, so that when the decree for sale was passed the controversy over his claim was not at issue. This decree, though entered in the Circuit Court for the Northern District of Ohio, purports to foreclose divisional mortgages in Indiana and Illinois, and to order to a separate sale property without the territorial jurisdiction of the court, although there is no prayer for such relief, and there is nothing in the decree intended to operate upon the defendant mortgagor company to compel a conveyance of property in another jurisdiction. The decree provided that each division of the road covered by an underlying divisional mortgage should be offered separately, and then the whole road east of the Mississippi River should be offered as a unit. If the sum offered

for the whole road exceeded the total of the separate bids the road was to be struck off to the one making the unit bid, and the share of each division in the amount of the unit 'bid was to be determined in the proportion of the separate bids. The decree provided that no bids should be received on the Ohio bid which did not equal the sum due on both the Ohio divi- sional mortgages, and that no bid should be received on the Indiana division which did not equal the amount due on the first Indiana divisional mortgage. Under this decree, Joy and his associates, the purchasing committee in the previous foreclosure proceedings, became the purchasers of the road on their unit bid of $15,500;000. This exceeded by several thousand dollars the sum total of the bids on the separate divisions of the road. The separate bid on the Ohio property amounted to $2,840,595.68, or a little more than enough to pay the principal and interest of the two divisional mortgages. The separate bid on the Indiana division was $3,650,000. This was about $1,300,000 less than would have been required to pay the second divisional mortgage on that division. The purchasing committee organized a new company called the Wabash Railroad Company, to which they conveyed the rail- road.

The new company was made a party below to contest Compton's lien and his right to a resale or redemption of the Ohio property, and is a party to this appeal to oppose the reversal or modification of the decree, claiming to assert the rights of all mortgagees whose interests passed to the purchaser by the foreclosure proceeding. Because of the dis- cussion of the effect of the decree for sale on Compton's right, it is necessary to make a somewhat fuller reference to it. After finding the amount due upon each mortgage and fore- closing each mortgage in default of the several payments directed to be made by the mortgagors, the decree ordered a sale at the city of Chicago, at which the mortgaged property should first be offered for sale separately, as described in each of the divisional mortgages. It was further provided that there should be deposited with the special master as security for each bid $100,000 in cash or in bonds; that after such bids

had been made they should be accepted conditionally upon the result of the offer of the entire railway as a unit; that, if the highest bid for the railroad as an entirety exceeded the sum of the highest bids for the separate divisions, the entire property should be struck off to the highest bidder for the entire road; that in such case the court would distribute to each division its share of the unit bid in proportion to the separate bids received for the separate divisions, and that in case of a sale of the property as a unit the purchaser must deposit in cash or in bonds $900,000 as a pledge that he would comply with his bid. The provision with reference to the payment was as follows:

"There shall be paid in cash, of the price at which the said mortgaged premises and property shall be sold, in addition to the amount which may be paid at the time of sale, such further sums thereafter of the purchase-money as the court may direct. The remainder of such purchase price may be paid either in cash, or in bonds, with the overdue coupons thereto appertaining, at such proportion or value as the holders thereof would be entitled to receive thereon in case the said purchase price were paid by the purchasers in cash, and in all cases in which bonds shall be received by the said special masters, whether as a deposit at the time of said sale or sales, to bind the bids thereat, or in payment of the remainder of the purchase price at the time of the consummation of such sale or sales, the said bonds shall be so received at the rate or amount to which the holders thereof will be entitled to dividend thereon, and in case of the receipt of bonds for security at the time of sale, the said special masters shall at the time exercise their judgment in determining the probable amount of the dividend to which such bonds will be entitled."

The decree directed that upon the confirmation of the sale by the court and the full payment of the entire purchase price, and the compliance by the purchaser with the condition of the sale and orders of the court in that behalf, the special masters should convey the property by good and sufficient deed, to vest in the grantee "all the right, title, estate, interest, property and equity of redemption except as hereby re-

served of, in and to all and singular the real estate, property, premises and franchises therein described in fee simple forever, and shall entitle the grantees to the possession thereof."

All questions of account between the several different divisions of the railway as to earnings and expenses, as to payments made by the receivers on coupons or bonds secured by the mortgages upon the divisions, and all questions of the disposition of the proceeds arising from the sales under the decree, were reserved for future settlement and adjustment. The masters were required to pay the proceeds into court to remain subject to the further order of the court. The decree then proceeded:

"All other questions arising under any of the pleadings or proceedings herein not hereby disposed of or determined are hereby reserved for future adjudication; including the claim for unearned interest on bonds not yet due.

"And the defendant James Compton having in open court on the final hearing herein objected to the rendering or entry of any decree in this cause at this time on the ground that the issue raised by the amendment to the complainants' amended and supplemental ancillary bill and to the cross-bill of the cross-complainants Solon Humphreys and Daniel A. Lindley, trustees, and the answers of the defendant James Compton to be filed herein have not been tried and determined, the court overrules such objection, and the defendant James Compton duly excepts to such ruling and the entry of this decree. But it is adjudged and decreed in the premises that the rendering and entry of this decree in advance of the trial and determination of such issues is upon and subject to the following conditions, to wit.:

"If upon the determination of such issues it shall be adjudged by this court that the decree rendered by the Supreme Court of the State of Ohio, in the suit brought by said James Compton against the Wabash, St. Louis and Pacific Railway Company and others, referred to in the pleading herein and the lien thereby declared and adjudicated in his favor, continue in full force and effect, then the purchaser or purchasers at any sale or sales had hereunder

of that portion of the property sold, covered and affected by said lien or the successors in the title of said purchaser or purchasers shall pay to said James Compton or his solicitors herein within ten days after the entry of the decree herein in favor of said James Compton the sum of three hundred and thirty-nine thousand nine hundred and twenty dollars and forty cents, with interest thereon at six per cent per annum from May 1, 1888, being the amount found due on the equipment bonds by him owned, by the Supreme Court of Ohio, in his said suit, upon the surrender by him of the bonds and coupons owned by him, referred to in his petition in such suit; and in default of such payment this court shall resume possession of the property covered and affected by the said lien of the defendant James Compton, and enforce such decree as it may render herein in his favor by a resale of such property or otherwise as this court may direct.

"And it is further ordered and adjudged, that notwithstanding the entry of this decree the said issues concerning the claim and interest of said Compton shall proceed to a final determination and decree in accordance with the rules and practice of this court, and any decree rendered thereupon shall bind the purchaser or purchasers at any sale or sales had hereunder, and all persons and corporations deriving any title to or interest in the said property affected by such lien from or through them, or any of them, and nothing in this decree contained shall be construed as an adjudication of any matter or thing as against the said James Compton, or to prejudice, annul or abridge any right, claim or interest or lien which the said James Compton may have in, to or upon the premises hereby directed to be sold, or any part thereof, or in, to or upon any property whatsoever embraced in this decree; it being the intention to hereby preserve the rights of said Compton in the relation in which he now stands towards the mortgagees parties hereto.

"Any sale, conveyance or assignment of the railway and property hereinabove described made under this decree shall not have the effect of discharging any part of said property from the payment or contribution to the payment of claims

or demands chargeable against the same, whether for costs and expenses, the expenses of the receivership of said property and the full payment of all the debts and liabilities of the receivers of the Wabash, St. Louis and Pacific Railway Company, namely, Solon Humphreys and Thomas E. Tutt, Thomas M. Cooley and General John McNulta, or upon intervening claims and allowances that have been or may hereafter be charged against the property of the Wabash, St. Louis and Pacific Railway Company or any part thereof, or said receivers or either of them, or the adjustment of any equities arising out of the same between the parties thereto, or their successors, either by this court or by the Circuit Court of the United States for the Eastern District of Missouri, or by any United States Circuit Court exercising either original or ancillary jurisdiction over said property of the Wabash, St. Louis and Pacific Railway Company, or any part thereof, or by any United States Circuit Court to which any of the parties in the consolidated cause of the Central Trust Company of New York and others against the Wabash, St. Louis and Pacific Railway Company and others in the Circuit Court of the United States for the Eastern District of Missouri, including the receivers, have been by said Circuit Court of the United States remitted in proceedings or actions ancillary to the jurisdiction of said last-named court or otherwise.

"Nor shall any such sale, conveyance, transfer or assignment made under and pursuant to this decree withdraw any of said railroad property or interests to be sold under this decree as hereinbefore directed from the jurisdiction of this and the other courts aforesaid, but the same shall remain in the custody of the receiver until such time as the court shall on motion direct said property in whole or from time to time in part to be released to the purchaser or purchasers thereof or any of them, and shall afterwards be subject to be retaken, and, if necessary, resold if the sum so charged or to be charged against said property or any part thereof, or said receivers shall not be paid within a reasonable time after being required by order of this or said other courts.

" The conveyance and transfer of said property sold under this decree shall be subject to the powers and jurisdiction of the said courts, and the purchasers of the property sold under this decree or any part thereof, and the parties hereto or their successors, shall thereby become and remain subject to said jurisdiction of said courts so far as necessary to the enforcement of this provision of this decree, and such jurisdiction shall continue until all the claims and demands have been or may be allowed against said property of the Wabash, St. Louis and Pacific Railway Company or any part thereof, or said receivers, by order of said courts, shall be fully paid and discharged.

" The provision aforesaid shall apply to the purchasers of the same under this decree, and all persons taking said property through or under them, but the foregoing provisions shall not nor shall any reservation of this decree contained have the effect or be construed, nor are they or any of them intended, to give to any claims that may exist any validity, character or status superior to what they now have, nor to decide or imply that any such claims exist.

" The effect of said provisions and reservations shall be to prevent this decree operating as an additional defence to claims, if any there are, prior in right to the liens of the mortgages upon said property heretofore and hereby foreclosed, and to preserve the prior right and lien of such claims and all allowances if found and decreed to exist."

The masters reported the making of the sale in accordance with the decree, and the sale was confirmed May 18, 1889. On June 18 an order requiring the masters to execute a deed and to deliver possession was made. This order recited that the purchasers had on deposit a large number of the bonds under all the mortgages, giving the exact amount of each, and then proceeded:

" And it further appearing that the said purchasers, by their said petition, offer to deposit at such time and in such amounts as the court may direct, cash sufficient to pay the expenses that the court may require to be paid, and to pay such sums on first-mortgage bonds and funded-debt bonds not deposited

in said trust company as the court may direct to be paid in cash, and, as security for such payment, to deposit all or any part of the bonds held by said trust company as the court may direct, and to substitute cash for bonds at such time and in such amounts as the court may require, and further, to hold the said purchased property subject to be retaken by the court in the event any cash payments directed by the court shall not be made in pursuance of the court's direction.

"The court thereupon, having duly considered the premises, does order, adjudge and decree that the prayer of said petition be granted; that the said purchasers shall forthwith transfer to the said special masters, Bluford Wilson and A. J. Ricks, the bonds deposited with the Central Trust Company of New York, and hereinbefore mentioned, to be held and disposed of by said special masters as the court may direct. Notwithstanding such transfers of said bonds to said masters, said purchasing committee shall pay all such sums as may be required from them in carrying out their purchase, and in case of their failure to comply with any orders of the court with respect thereto, the court may retake the property, and all of it conveyed by said deed, and annul the title of the purchasing committee with respect thereto, and hold the same for further disposition and as security for the rights of the bondholders under the various mortgages foreclosed. Upon such transfer the said special masters shall forthwith make, execute and deliver to said purchaser a deed or deeds, conveying to them or their assigns all and singular the railways, premises and property described in and covered by the said several mortgages foreclosed and sold as aforesaid under the decree in this cause, and all the right, title, interest and estate of all the parties in said cause, of, in and to the same and each and every part thereof, except as particularly reserved in and by said decree of foreclosure and sale, by a good and sufficient deed therefor."

Then followed an order to deliver possession, closing with these words: "This order is made subject in all respects to the provisions of said decree of March 23, 1889."

On August 17, 1889, the court ordered "that the issues

presented in this cause as to the lien and claim of James Compton, made by the various pleadings herein, upon and concerning said claim and lien, and reserved in the former decree herein, saving the rights of said Compton, be and the same are hereby referred to Bluford Wilson," etc.

The special master reported that Compton's lien was a valid one, and that he was entitled by the saving clause of the decree to have the Ohio division resold if the purchaser did not pay off his bonds, principal and interest in full. The court below sustained the master in holding Compton's lien valid, but decided, as already stated, that his only remedy was to redeem the four divisional mortgages, two in Ohio and two in Indiana. Compton's counsel filed affidavits at the final hearing below to show that their client was deterred from bidding by their advice that the saving clause in the decree made it unnecessary for him thus to protect his claim, because if his lien was held to be valid the purchaser was required to pay it off or let the property go to a resale, and that but for his reliance on the saving clause Compton could easily and safely have made a bid high enough to secure the payment of his claim from the proceeds of sale.

The facts on which turned the issue as to whether the divisional mortgages were a first lien on the Toledo terminals were as follows:

The first Ohio company was the Toledo and Illinois Railroad Company. Its charter of incorporation, dated April 20, 1853, provided for building a railroad from the city of Toledo through the counties of Lucas, Henry, Fulton, Defiance and Paulding, or parts of said counties, to the west boundary line of the State of Ohio, in the township of Harrison, in Paulding County. On September 8, 1853, it made a mortgage (known as the first Ohio mortgage) to the Farmers' Loan and Trust Company, to secure an issue of bonds amounting to nine hundred thousand dollars. The property covered by that mortgage was described as follows, viz.:

"Their road made and to be made, including the right of way and the land occupied thereby, together with the superstructure and tracks thereon, and all rails and other materials

and machinery used thereon or procured therefor, including the furniture and equipments of the road and those to be purchased or paid for with the above-described bonds, and the bridges, viaducts, culverts, fences, depot grounds and buildings erected or to be erected thereon, and all franchises, rights or privileges of the said party of the first part of, in, to or concerning the same."

The habendum clause is : " To have and to hold the said premises and every part thereof, with the appurtenances unto the same party of the second part."

In June, 1856, the Toledo and Illinois Railroad Company entered into an agreement of consolidation with the Lake Erie, Wabash and St. Louis Railroad Company, and the Toledo, Wabash and Western Railroad Company was thereby formed. That agreement provided that " All mortgages given by either of the parties shall be as valid and binding upon the whole of the road, real estate, fixtures and personal property which may be described in such mortgage as though the same had been originally executed by such consolidated corporation."

The Toledo, Wabash and Western Railroad Company made a mortgage which was subsequently foreclosed. By the decree of sale the purchaser of the Ohio part, Boody, took subject to the first mortgage. Boody conveyed the Ohio division to a new Ohio corporation, organized with power to construct, maintain and operate a road from Toledo to the Indiana state line, and called the Toledo and Wabash Railroad Company. This company, on October 12, 1858, gave a bond to Edwin D. Morgan, trustee, for $900,000, and secured it by mortgage of its railroad, made and to be made ; all right of way and all lands occupied thereby, together with the superstructure, depots, depot grounds and buildings erected thereon, and the rails, tracks, side tracks, bridges, fences, viaducts, culverts, rights, privileges, franchises and accessions of the party of the first part, together with all its rolling stock, machinery, furniture and equipments of its said road now and hereafter to be acquired, being the same property described in the deed of Matthew Johnson, marshal and commissioner, to A. Boody,

Esq., and dated October 8, 1858, and by A. Boody conveyed to the party of the first part.

The habendum clause was "To have and to hold the premises and every part and parcel thereof, and all its increase, accessions and incidents unto the said Morgan and his successors," etc.

The condition of the mortgage and bond was that the Toledo and Wabash Railroad Company would pay the $900,000 of bonds issued by the Toledo and Illinois Railroad Company and secured by the first mortgage. The mortgage recites that it is executed for the benefit of the bondholders under the first mortgage. On October 15, 1858, the Toledo and Wabash Railroad Company gave a second mortgage to E. D. Morgan, trustee, for $1,000,000, in which the description of the property conveyed is the same as above, as is also the habendum clause. The true intent and meaning of this mortgage is declared to be as follows:

First. That this mortgage attaches to the property above described as subject to and subordinate to said bonds of the Toledo and Illinois Railroad Company, or said issue of nine hundred thousand dollars, whether evidenced by said bond of the party of the first part, made to Edwin D. Morgan, trustee, etc.

Second. That the party of the first part, or any railroad company into which it may become a component part by consolidation, shall be chargeable with said sum of nine hundred thousand dollars, as a prior lien and incumbrance to any other debt thereon.

The Toledo and Wabash Railroad Company of Ohio, soon after executing the foregoing mortgages, entered into articles of consolidation with the Wabash and Western Railway Company, an Indiana corporation, thereby forming the Toledo and Wabash Railway Company. It was provided in that agreement that all mortgages given by either of the parties "shall be as valid and binding upon the whole of the road, real estate, fixtures and personal property which may be described in such mortgage as though the same had been originally executed by such consolidated corporation."

This company took possession of the property and operated it. Later it acquired certain terminal property in Toledo. It issued the equipment. bonds. It made no mortgage at any time.

In 1865 the Toledo and Wabash Railway Company and various Illinois companies entered into an agreement of consolidation, whereby the Toledo, Wabash and Western Railway Company was formed. It was this agreement which created the lien in favor of the equipment bonds which was adjudicated in Compton's suit.

Another issue raised by the bill and cross-bills and Compton's answers was the effect of a decree of the United States Circuit Court of Indiana denying the existence of a lien in favor of equipment bonds of the same issue as those held by Compton, upon the Ohio decree in Compton's favor. It was contended by complainant below that Compton was a party to the Indiana decree, and was thereby estopped to plead the Ohio decree. The master and the court below decided in Compton's favor on this point. The facts in respect to this issue were as follows: In 1878 one Tysen brought suit on behalf of himself and such other owners of equipment bonds of this issue as might desire to come into said suit and contribute to the expense thereof, to establish that the bonds entitled their owners to a lien on the part of the Wabash main line extending from Toledo to the Illinois state line. The cause was removed to the Federal Circuit Court and resulted in a decree sustaining the lien. *Wabash, St. Louis & Pacific Railway* v. *Ham*, 114 U. S. 587; *S. C.* below, *Tysen* v. *Wabash Railway*, 15 Fed. Rep. 763. It was appealed to the Supreme Court of the United States, the decree of the lower court was reversed and the bill of complaint was dismissed. To this action Compton never became a party. When he began his suit the Indiana action had been discontinued. It. was subsequently revived, however, and then for the first time a lien was asserted under the consolidation statutes. Compton's counsel did file a brief in the Supreme Court, but he paid no part of the expense of the suit.

In 1880, pending the suit in the Indiana court, but prior

to the rendition of the Indiana decree, Compton began a suit in the common pleas court of Lucas County to establish and enforce a lien on the railroad extending from Toledo to the Illinois state line by virtue of his ownership of $150,000 of the par value of these equipment bonds. Compton made parties to this suit all the railway companies succeeding the Toledo and Wabash Railway Company (which issued the equipment bonds) in the ownership of the property and all the mortgagees whose mortgages were executed, after the issuance of the bonds, except the Central Trust Company and Cheney, trustees, who took their mortgage pending the appeal from the common pleas decree. Neither the Farmers' Loan and Trust Company nor E. D. Morgan, trustees of the underlying Ohio divisional mortgages, were parties.

In March, 1882, the common pleas court entered a decree sustaining the lien claimed, and ordered a sale of the part of the railroad in Ohio to pay the amount of the bonds found due, subject to the prior lien of the mortgages of the Farmers' Loan and Trust Company and E. D. Morgan, trustee on the same property. The cause was appealed to the District Court of the proper judicial district and by that court reserved for decision to the Supreme Court of the State, which in 1888 sustained the rulings of the common pleas court, *Compton* v. *Railway Co.,* 45 Ohio St. 592, found that the amount due on Compton's bonds was $339,920.40 with interest from May 1, 1888, and that this amount was a lien on the railroad in Ohio and Indiana, and ordered that on default in the payment of the amount due after ten days the Ohio part of the road should be sold to enforce the lien.

The finding and action of the Supreme Court of Ohio sufficiently appeared from the fifth and sixth paragraphs of its decree as follows:

"That upon the consummation of such consolidation, said bonds issued as aforesaid by the Toledo and Wabash Railway Company, known as equipment bonds, and all moneys due and to grow due thereon, and among them such of said bonds as are now owned, as aforesaid, by the plaintiff, and the moneys due and to grow due thereon, became an equitable

lien upon all of the said railroad and real property and
the structures thereupon, and the fixtures and appurtenances
thereto appertaining, which were owned by said Toledo and
Wabash Railway Company at the time of said consolidation,
and which through said consolidation passed to and vested
in the said Toledo, Wabash and Western Railway Company,
and which afterwards passed to and vested in the defendant,
the Wabash, St. Louis and Pacific Railway Company, which
last-named company was, at the time of the commencement
of this suit, in possession of the same, being all of its railroad
and property connected therewith, commencing in the city
of Toledo in the State of Ohio and extending therefrom
through the counties of Lucas, Henry, Fulton, Defiance and
Paulding in said State, and through the counties of Allen,
Huntington, Wabash, Miami, Cass, Carroll, Tippecanoe, Foun-
tain and Warren in the State of Indiana, to and terminating
at a point in the west line of State Line City in said last-
named county, and that said bonds are now a lien on such
railroad and property, and the plaintiff is entitled to enforce
the same.    That the said lien of said bonds is prior and supe-
rior to the rights, interests, estates, claims and liens of the
defendants in this action and each of them, in and upon said
railroad and property upon which said lien is hereby declared,
and is prior and superior to the rights, interests, estates,
claims and liens of all persons and corporations who have
derived any such rights, estates, claims and liens from, by or
through the said defendants, or any of them, since the com-
mencement of this action or otherwise; but as to all that part
of said railroad and property which is situate within the State
of Ohio, such lien is inferior and subject, but inferior and sub-
ject only to the two mortgages mentioned in the petition
herein, one of which was executed by the Toledo and Illinois
Railroad Company to the Farmers' Loan and Trust Company
on the eighth day of September, 1853, for the security of the
bonds of that company, amounting to $900,000, due as
extended August 1, 1890, and bearing interest at the rate
of seven per cent per annum, payable semi-annually on the
first day of February and August in each year, and the other

of which was executed by the Toledo and Wabash Railroad Company to Edwin D. Morgan, trustee, on the fifth day of October, 1858, for the security of the bonds of that company, amounting to $1,000,000, due on the first of November, 1878, and bearing interest at the rate of seven per cent per annum, payable semi-annually on the first day of May and November in each year.

"6. That the said defendants or any of them pay to said plaintiff the said sum of $339,820.40 now due on said bonds owned by the plaintiff as aforesaid within ten days from the entry of this decree, and if default shall be made in such payment that an order of sale issue for the sale as upon execution at law of all said railroad and real property, together with the structures thereupon, and the fixtures and appurtenances thereto appertaining, upon which the lien of said bonds, known as equipment bonds, is hereby declared to exist, which is situated in the State of Ohio and the jurisdiction of this court, subject, however, but subject only to the lien of the two mortgages hereinbefore mentioned as executed by the Toledo and Illinois Railroad Company to the Farmers' Loan and Trust Company and the Toledo and Wabash Railroad Company to Edwin D. Morgan, and to the indebtedness secured by each of said mortgages, and that from the proceeds of such sale the costs of this action as taxed be paid, and the residue of such proceeds be brought into court to abide its further order herein on the footing of this decree. That before offering the property, hereby directed to be sold, for sale, the officer conducting the same shall cause the same to be appraised according to law by three disinterested freeholders of either or any of the counties in which the same is situated, and such appraisal shall be of the value of said property subject to the incumbrance and lien of the two mortgages hereinbefore mentioned, as executed, respectively, by the Toledo and Illinois Railroad Company and the Toledo and Wabash Railroad Company, subject to which it is directed to be sold and over and above the lien of such mortgages according to the amount of the indebtedness secured thereby, as the same shall be ascertained by the officer

conducting such sale, with interest computed to the time of the sale."

After this case had ·been appealed to this court and before the hearing, a motion was made by appellees to· dismiss the appeal or affirm the decree of the court below on the ground that since the rendition .of the decree herein a decree had been rendered in the United States Circuit Court for Indiana on the same cause of action limiting Compton's remedy to a redemption of the four senior mortgages, two in Ohio and two in Indiana, and ·no appeal had been taken from that decree — and the record of the Indiana suit was filed to establish ground for the motion.    The record shows that the Indiana decree was exactly like ·that from which this appeal was taken, and contained the same provision in respect to Compton's lien requiring him to redeem the Ohio and Indiana divisions by payment of the amount due on· both the Ohio and the Indiana divisional mortgages, with interest within ten days, and in default of such payment he should be taxed with the costs of all the matters in connection with his intervention.

" Because the court find difficulty in reaching a· conclusion with reference to the .following questions, it is ordered that upon the foregoing statement of ·facts the following three questions, concerning which this court requests the instruction of the Supreme Court of the· United States for its proper decision, be certified to that court in accordance with section six of the act to establish Circuit Courts of Appeals, approved March 3, 1891.    The said questions are : .

" First.  Had Compton the right under the saving clause of the decree for sale to a decree for the redemption of the Ohio division only ?

" Second.  In fixing the amount to be paid in redemption, is he entitled to have the ·principal and interest of the mortgages to be redeemed reduced by the net earnings received by the purchaser ?

" Third.  Is the decree of the Circuit Court of the· United States for the District of Indiana between the same parties and ·unappealed from *res judicata* upon the foregoing questions in ·this court ?

"It is further ordered, for the convenience of the Supreme Court of the United States, that the opinions of Judge Taft and Judge Lurton in this cause be also certified to the Supreme Court of the United States.

"It is also further ordered, that all proceedings of the cause be stayed until the instructions of the Supreme Court upon these questions shall be received by this court."

*Mr. Attorney General Harmon* and *Mr. John G. Milburn* for appellant. *Mr. John H. Doyle* was on their brief.

*Mr. Rush Taggart* and *Mr. Henry Crawford* for appellees.

Mr. JUSTICE SHIRAS, after stating the case, delivered the opinion of the court.

When by virtue of the decrees of foreclosure in the several Circuit Courts of Ohio, Indiana and Illinois, entered March 23, 1889, the entire line in the three States was, on May 15, 1889, sold as a unit to the purchasing committee, and when that committee organized a new company, called "The Wabash Railroad Company," to which, on August 1, 1889, was conveyed the entire line so purchased, it would seem that all questions and disputes pending between the several mortgage trustees were settled and arranged upon the terms fixed by that decree. At all events, no appeal appears to have been taken by any party except Compton.

What are Compton's rights under the saving clause of the decree for sale; whether he is entitled, in case of a sale or redemption, to have the principal and interest of the prior mortgages reduced by the net earnings received by the purchaser since the sale, and what effect is to be given to the decree of the Circuit Court of the United States for the District of Indiana, are the questions certified to us by the Circuit Court of Appeals. It is true that the form in which the first question is put in the certificate would seem to go on the assumption that Compton's only right is to redeem, and that the disputable matter is whether the redemption is to cover

as well the Indiana as the Ohio division.   In the view, how-
ever, that we take of the subject, we prefer to read the certifi-
cate as propounding the question of the real meaning and
effect of the decree of sale as affecting Compton's rights, and
to thus enable the Circuit Court of Appeals to finally deter-
mine the controversy.   It is, indeed, contended in the appel-
lees' brief that this court is precluded, by the form of the
question, from going back of the decree of the Circuit Court,
requiring Compton to redeem, but the Circuit Court of Appeals
has certified to us for our consideration, in connection with
the questions propounded, the entire decree of the Circuit
Court, a full statement of the history of the whole case, and
copies of the opinions of the Circuit Judges, in which are fully
discussed the various questions that arise under the appeal to
the Circuit Court of Appeals; among others the very question
whether Compton's right is or is not a right to have a resale.
And this alleged right of Compton is considered at length, in
every aspect, in the briefs of the respective counsel.

It may be well to have before us the very language of that
portion of the decree which we are asked to construe :

" And the defendant James Compton, having in open court,
on the final hearing herein, objected to the rendering or entry
of any decree in this cause at this time, on the ground that the
issue raised by the amendment to the complainant's amended
and supplementary ancillary bill and to the cross-bill of the
cross-complainants, Solon Humphreys and Daniel A. Lindley,
trustees, and the answers of the defendant, James Compton,
to be filed herein, have not been tried and determined, the
court overrules such objection, and the defendant, James
Compton, duly excepts to such ruling and the entry of this
decree.   But it is adjudged and decreed in the premises that
the rendering and entry of this decree in advance of the trial
and determination of such issues is upon and subject to the
following conditions, to wit :

" If, upon the determination of such issues, it shall be ad-
judged by this court that the decree rendered by the Supreme
Court of the State of Ohio, in the suit brought by said James
Compton against the Wabash, St. Louis and Pacific Railway

Company and others, referred to in the pleading herein, and the lien thereby declared and adjudicated in his favor, continue in full force and effect, then the purchaser or purchasers, at any sale or sales hereunder of that portion of the property sold, covered and affected by said lien, or the successors in title of said purchaser or purchasers, shall pay to the said James Compton or his solicitors herein, within ten days after the entry of the decree herein in favor of said James Compton, the sum of three hundred and thirty-nine thousand nine hundred and twenty dollars and forty cents, with interest thereon at six per cent per annum from May 1, 1888, being the amount found due on the equipment bonds by him owned, by the Supreme Court of Ohio in his said suit, upon the surrender by him of the bonds and coupons owned by him, referred to in his petition in this suit; and in default of such payment this court shall resume possession of the property covered and affected by the said lien of the defendant James Compton, and enforce such decree as it may render herein in his favor by a resale of such property or otherwise as this court may direct.

"And it is further ordered and adjudged that, notwithstanding the entry of this decree, the said issues concerning the claim and interest of said Compton shall proceed to a final determination and decree in accordance with the rules and practice of this court, and any decree rendered thereupon shall bind the purchaser or purchasers at any sale or sales had hereunder, and all persons and corporations deriving any title or interest in said property affected by such lien, from or through them or any of them, and nothing in this decree contained shall be construed as an adjudication of any matter or thing as against the said James Compton, or to prejudice, annul or abridge any right, claim or interest, or lien which the said James Compton may have in, to or upon the premises hereby directed to be sold, or any part thereof, or in, to or upon any property whatsoever embraced in this decree; it being the intention to hereby preserve the rights of said Compton in the relation in which he now stands towards the mortgagees parties hereto."

The masters reported the making of the sale in accordance with the decrees, which sale was confirmed May 18, 1889, and on June 18 an order requiring the masters to execute a deed and to deliver possession was made.   On August 17, 1889, the court ordered " that the issues presented in this cause as to the lien and claim of James Compton, made by the various pleadings herein upon and concerning said claim and lien, and reserved in the former decree herein saving the rights of said Compton, be and the same are· hereby referred to Bluford Wilson as special master," etc.

The special master reported that Compton's lien was a valid one, and that he was entitled by the saving clause of the decree to have the Ohio division resold if the purchaser did not pay off his bonds, principal and interest, in full.   The Circuit Court sustained the master in holding Compton's lien valid, but decided that his only remedy was to redeem the four ·divisional mortgages, two in Ohio and two in Indiana.   In refusing Compton a right to a resale of the Ohio property, and in restricting him to a redemption of the Ohio and Indiana divisions in favor of the divisional mortgages thereon, we think the Circuit Court erred.

The language of that court was as follows :

" There is nothing in the reservations of the decree of March 23, 1889, which requires the court to order a resale of the property covered by Compton's equitable lien.   That lien was in fact discharged by the foreclosure of the four mortgages ahead of it, which foreclosure Compton had no right to interfere with or delay.   The reservations in the decree of sale were not intended to and cannot affect the purchaser's title acquired under those mortgages.   We cannot properly, therefore, direct a resale without disregarding the prior right of said mortgagees and of the purchasers who have succeeded thereto.   If we had the discretion to do so, it should not be exercised in his favor, for it does not appear that any larger sum could be obtained on a resale; it is not shown that it sold for an inadequate price, and Compton offers no guaranty or security that a resale will bring a larger amount and realize a surplus to which he would be entitled.   It is not proper for

the court to order resales as a matter of experiment, and thereby cast clouds upon the title of the purchasers or present owner. As stated by the Supreme Court in *Robinson* v. *Iron Mountain Railway*, 135 U. S. 522, his failure to offer to redeem is evidence that he does not think the property was worth more than it brought at the sale. Besides he was as free to bid at the sale already made as he would be upon a resale. Under such circumstances we give full effect to his equitable lien by allowing him to redeem the property upon the terms indicated."

We think that these observations show a plain oversight or disregard by the learned court of the terms and obvious meaning of the decree of March 28, 1889. When the terms of that decree were fixed, all parties to be affected thereby agreed to the same. The issues raised by the pleadings as to Compton's claim were still pending and undetermined. It was evidently the wish and the interest of all the other parties to have the sale effected at once, and, in order to avoid the further delay that would be occasioned by awaiting the determination of those issues, the provisions or reservations in Compton's favor were put in the decree.

Substantially those provisions were that the entry of the decree of sale should not foreclose Compton's claim, but that the issues concerning it should be inquired into and determined; "that if upon the determination of such issues it shall be adjudged by the court that the decree rendered by the Supreme Court of Ohio, in the suit brought by said James Compton, referred to in the pleadings herein, and the lien thereby declared and adjudicated in his favor, continues in full force and effect, then the purchaser or purchasers at any sale or sales had hereunder of that portion of the property sold, covered or affected by said lien, or the successors in the title of said purchaser or purchasers, shall pay to said James Compton or his solicitors herein, within ten days after the entry of the decree herein in favor of said James Compton, the sum of three hundred and thirty-nine thousand nine hundred and twenty dollars, with interest at six per cent per annum from May 1, 1888, . . . and in default of such

payment this court should resume possession of the property covered and affected by the said lien of the defendant James Compton, and enforce such decree as it may render herein in his favor by a resale of such property or otherwise as this court may direct."

When the report of the special master finding the issues in Compton's favor, that his lien was a valid one, and that he was entitled to have the Ohio division resold if the purchaser did not pay off his bonds as provided in the decree, was sustained by the court so far as the validity of Compton's lien was concerned, we do not think it was open for the court, consistently with the terms of the decree of March 23, 1889, to deprive Compton of the rights and remedies therein conferred. The various questions and equities arising out of the dates of the mortgages, etc., which are discussed by the court, were all waived and removed from consideration, so far as Compton was concerned, by the express provisions of the decree. It is suggested that because it was said that the decree in Compton's favor should be enforced by a resale of the property or *otherwise* as the court might direct, that thereby it was intended that the court should have as full power to determine and regulate Compton's rights and remedies as if the reservations in the decree had never been made. This we think a strained and unnatural interpretation to put upon the phrase mentioned. We do not understand it as intended to enable the court to disregard its decree of March 23, but rather as a provision in Compton's favor — as, for instance — that the court might empower Compton to take possession of the property covered by his lien, instead of resorting to a sale.

When the Circuit Court speaks of a resale as inequitably affecting the rights of the prior mortgagees and of the purchasers who have succeeded thereto, it is evident that the court overlooked those provisions of the decree which, in express terms, subjected such purchasers to Compton's rights to a resale, if they do not choose to pay him the sum awarded by the decree. So, when the court says that Compton could as well have been a bidder at the sale as at a resale if one be ordered, it omits to notice that when the sale took place under

the decree Compton's claim was still undetermined, but that provision had been made for him in the event that his claim was held valid. He could not safely bid because he could not foresee whether his claim would be allowed, and the arrangement made relieved him, very properly, from the perplexity to which he would have been subjected if the sale had been unconditionally made. when the fate of his claim was still uncertain.

It was well said by Mr. Chief Justice Waite, speaking for this court in *Fosdick* v. *Schall*, 99 U. S. 252, that "railroad mortgages . . . are peculiar in their character and affect peculiar interests. The amounts involved are generally large, and the rights of the parties oftentimes complicated and conflicting. It rarely happens that a foreclosure is carried through to the end without some concessions by some parties from their strict legal rights, in order to secure advantages that could not otherwise be attained, and which it is supposed will operate for the general good of all who are interested. This results almost as a matter of necessity from the peculiar circumstances which surround such litigation."

The decree of March 23, 1889, under which the sale was made and confirmed on May 18, 1889, was, in all essential respects, the final decree in the case, the questions reserved being merely incidental to carrying the decree into full effect. That portion of said decree which established Compton's rights was in its nature final; the only matter which was kept in reserve as respects Compton was the awaiting the determination of the validity and amount of his claim by the report of the special master. And it may well be doubted whether it was competent for the Circuit Court at a subsequent term to disturb the rights of Compton defined and adjudicated at a previous term in the final decree of sale. In several particulars the case of *Central Trust Co.* v. *Grant Locomotive Works*, 135 U. S. 207, would seem to be applicable. That was a case like the present one, of several suits brought to foreclose mortgages in two or more of the Circuit Courts of the United States having jurisdiction over distinct railroads which had been consolidated. Two such suits were brought in the Circuit Court for

the Southern District of Ohio, and a receiver was appointed. While the proceedings were pending the Grant Locomotive Works intervened by petition in both suits, and set up claims arising out of the use by the receiver of certain locomotive engines belonging to the intervenor. Upon a hearing and on the 22d day of December, 1883, of the October term, orders were entered in each of said causes in favor of the intervening petitioner, by which the receiver was ordered to pay certain considerable sums to the Grant Locomotive Company by way of rent and purchase money of the engines, and further declaring that the said several amounts with interest thereon should be a charge upon the earnings, income and all. the property of the, Toledo, Cincinnati and St. Louis Railroad Company (the consolidated company), and especially of the Ohio division, prior to the first mortgage or other bonded debt of said railroad or of said division thereof, and that any balance of said several amounts remaining unpaid at the date of the foreclosure and sale of said railroad or division should be a first_lien thereon, and the said sale should be made subject. thereto. On March 7, 1884, the same being one of the days of the February term, these orders were suspended by an order of the court, the petitioner objecting. On March 15, 1884, the Central Trust Company, complainant, filed an answer to the intervening petition, and also a petition for a rehearing and review of the orders of December 22, 1883, which it further asked should be annulled and set aside.

On April 10 of the April term, 1884, the court ordered and decreed that the said decrees of December 22, 1883, be set aside and annulled. In June, 1884, the two Ohio divisions of the railroad were sold, and the sales were confirmed by an order made July 9, 1884. The decrees for sale contained provision for the payment into the court by the purchasers at these sales of certain amounts of cash, and also provided that the decrees of confirmation of the sale should be subject to the terms and provisions of the decrees of sale theretofore made; and the court reserved the right to resell said railroad property upon failure by the purchasers to comply with such terms and provisions.

On the 8th day of February,.1887, the Grant Locomotive Works and R. S. Grant severally filed petitions in said causes, setting forth the matters hereinbefore detailed, and alleging that the orders of April 10, 1884, purporting to annul the decrees of December 22, 1883, were void, and that those decrees were still in force. The Central Trust Company answered, and the purchasers of the Ohio divisions demurred; and on June 11, 1887, the court adjudged and decreed that the order of April 10, 1884, be set aside, and that the said orders of December 22, 1883, be restored. January 28, 1889, on motion of the intervening creditors that the purchasers of the railroad property be required to pay into the registry of the court, for the use of the intervenors, the amounts due under the decrees, and that in default thereof the said railroad property be resold for the benefit of the intervenors, decrees so prayed for were entered over the objections of the Central Trust Company and of the purchasers. The court also refused to entertain bills of review on the part of the Central Trust Company and of the purchasers, seeking to have said orders of December 22, 1883, reconsidered.

From these orders and decrees an appeal was taken on the part of the Central Trust Company and the purchasers to this court, where the action of the Circuit Court was approved, and it was *held* that if the decree of sale in a suit for foreclosing a railroad mortgage provides that the purchaser shall pay down a certain sum in cash when the sale is made and do certain other acts prescribed, the purchaser is bound by the decision of the court as to such other claims, and has no appealable interest therein; that a decree, in a suit for foreclosing a railroad mortgage, that the claim by an intervening creditor of an interest in certain locomotives in the possession of the receiver and in use on the road was just and entitled to priority over the debt secured by the mortgage, is a final decree upon a matter distinct from the general subject of the litigation, and it cannot be vacated by the court of its own motion after the expiration of the term at which it was granted.

In the opinion in this case, *Swann* v. *Wright's Executor,*

110 U. S. 590, was cited. There Swann had purchased a railroad under a decree which provided that the sale should be subject to the liens already established, or which might be established on references then pending, as prior and superior to the lien of the mortgage, and the claim of Wright was one of this class. It was pending before the master and reported on after the sale, when the purchaser applied to oppose its confirmation, and was not allowed to do so; and Swann afterwards filed a bill to set aside Wright's claim for fraud in its inception, which bill was dismissed, and the dismissal was on appeal affirmed on the ground that the property was purchased expressly subject to all established claim or claims which might be established on references then pending, which included Wright's, and it was decided that as neither the purchaser nor his grantee proposed to surrender the property to be resold for the benefit of those concerned, such purchaser had no standing in court for the purpose of relitigating the liens expressly subject to which he bought and took title.

The apprehensions expressed in their brief by the learned counsel of the appellees, that because of the absence of the other holders of the equipment bonds, the purchasers or their successor, the Wabash Railroad Company, may yet be subjected to their claims, are without foundation. It would seem that their claims were disposed of by the decree of this court in the case of *Wabash, St. Louis & Pacific Railway* v. *Ham*, 114 U. S. 587, where it was held that the property sold under the decree of foreclosure is not subject to any lien in favor of the holders of the equipment bonds. We think it quite plain that Compton is the only party having an interest in and a right to enforce the decree of the Ohio Supreme Court. The provision contained therein assessing the amount of his claim at the amount of the bonds held by him shows that the decree was intended to operate solely for his benefit, and the direction that the proceeds of sale should be brought into court, to abide its further order on the footing of the decree, is the order usually made when a sale is made by an officer appointed by the court. Such a sale might result in a sum in

excess of Compton's claim, and, in such event, there would be room for a further order of the court.

This view of the import of the decree of March 23, 1889, relieves us from a consideration of the difficult questions that would arise if Compton were compelled to proceed by way of redemption. Those questions are discussed with learning and ability in the respective opinions of the Circuit Judges, furnished us in connection with the certificate, and also in the elaborate briefs of the appellees' counsel. *Compton v. Wabash Railroad*, 31 U. S. App. 486.

But, as we have already said, all parties who have had the benefit of the decree of sale are precluded from going back of it, and from now raising questions that might otherwise have arisen. Not only were those who were parties to the proceedings in the Ohio court bound by the decree, therein reached, that Compton had a right to sell the Ohio line in satisfaction of his lien, but the Ohio divisional mortgagees who were not parties to that decree, but who procured, or, at least, have acquiesced in, the decree of March 23, 1889, and have participated in the benefits of the early sale thus secured, have no right now to object to the enforcement of Compton's lien in the manner pointed out in the decree. *The Stephen Morgan*, 94 U. S. 599; *Mount Pleasant* v. *Beckwith*, 100 U. S. 514.

No objections were taken by any of the parties to the decree of sale of March, 1889, either for want of parties or for any other reason. Indeed, it was plainly a conventional decree. Any inconvenience that would be occasioned by a resale of a portion of the entire line can be avoided by complying with the decree and making payment accordingly. If the Wabash Railroad Company be regarded simply as an outside purchaser, it cannot be heard to object to the terms of the decree of sale. If, what is apparently its real character, it be regarded as a company formed by an arrangement between the parties controlling the sale, it has even less right to disregard the rights of Compton as stipulated for in the decree.

The next question put is whether Compton is entitled to have the prior mortgages on the Ohio division reduced by the

net earnings received by the purchasers since the receivers turned over possession of the road to them.

If the Wabash Railroad Company, as the successor of the purchaser at the sale, is to be regarded as the Ohio mortgagees in possession, it is liable to account for the rents and profits or net earnings of the mortgaged property. Such, certainly, is the general rule when property is redeemed, either by the mortgagor or by a junior incumbrancer having a right to redeem, and we see no reason why that rule should not be applied in a case like the present. Jones on Mortgages, 5th ed. vol. 2, § 114.

But we think the better view is that the Wabash Company should be regarded as a party in possession under the express terms of the order of sale, and as representing all parties in interest, including Compton; and hence cannot claim to be an absolute purchaser of the rights of a mortgagor not subject to account for rents and profits. In that point of view there is a trust relation, which involves an accounting until Compton is disposed of.

Whether the decree of the Circuit Court of the United States for the District of Indiana between the same parties and unappealed from, and which, while recognizing Compton's lien, declares his remedy to be a redemption of the railroad in Indiana and Ohio, estops Compton from enforcing his lien or claim against the Ohio division only, is the third question put to us.

This question should be answered in the negative, and, indeed, is covered by the view which we take of the real nature of Compton's remedy, as entitling him to a sale of the Ohio division if his debt should not be paid by the purchaser under the decree of sale. Compton's claim, in its present status, consists of the decree of the Ohio state court in his individual favor, fixing the amount of his debt, and decreeing a sale of the Ohio property, and of the decree of sale of the Circuit Court of the United States affirming the decree of the Ohio court as to the validity and amount of the claim, and providing that if it should not be paid by the purchaser, Compton should have a right to a sale of the Ohio road or to some equivalent remedy.

Upon the theory of the mortgagees themselves, the suits in the Circuit Courts of Ohio and Indiana were two distinct proceedings, having in view the sale of two distinct portions of the road, and while the decree of the Circuit Court of the Indiana district may restrict Compton from proceeding in that court and district, so as to affect property in Indiana, except on the terms of that decree, such decree cannot, as we view it, be used by the purchaser to affect or defeat Compton's rights in the Circuit Court of the United States for the Ohio district. This contention overlooks the distinction between Compton as one of a class of bondholders and Compton recognized in the decree as the owner of a final judgment or decree of the state court of Ohio.

Upon the whole, we answer the questions propounded thus:

*1st. That the decree of sale of March 23, 1889, confers upon Compton, in event that his claim shall not be paid by the purchaser, the right to a decree of resale of the property situated in Ohio and covered and affected by his lien.*

*2d. That, in event of such sale, and in applying the proceeds thereof, Compton will be entitled to an account of the net earnings of the Ohio division over and above all operating expenses, taxes paid and cash paid, if any, in redemption of receiver's certificates and other expenses properly chargeable against the Ohio division, which net earnings should be deducted from the amount due on the two prior mortgages on said division.*

*3d. That the decree rendered in the Circuit Court of the United States for Indiana is not* res judicata *upon the foregoing questions.*

*Let it be so certified.*