**Jean P. LYNCH, Individually and on behalf of all persons similarly situated, Plaintiffs,**

**Jesse M. Hughes, Intervening Plaintiff,**

v.

**William J. BAXLEY, Individually and as Attorney General of the State of Alabama, et al., Defendants.**

**Civ. A. No. 74–89–N.**

United States District Court,
M. D. Alabama, N. D.

Dec. 14, 1974.

Edward Still, Birmingham, Jack Drake, Drake, Knowles & Still, Tuscaloosa, Ala., for plaintiff.

Robert D. Segall, Hobbs, Copeland, Franco & Screws, Montgomery, Ala., for intervening plaintiff.

William J. Baxley, Atty. Gen., and Frank P. Ralph, Asst. Atty. Gen. of Ala., Montgomery, Ala., for defendant William J. Baxley.

George B. Azar, Azar Campbell & Azar, Montgomery, Ala., for defendant Perry Hooper.

William J. Baxley, Atty. Gen., of Ala., and Robert L. Humphries, Asst. Atty. Gen., of Ala., Dept. of Mental Health, for defendants Taylor Hardin and Fred L. Huggins.

Before RIVES, Circuit Judge, and JOHNSON and VARNER, District Judges.

JOHNSON, District Judge:

The named plaintiff and intervening plaintiff,[1] suing on their own behalf and as representatives of a class composed of persons who are now, or who may be, involuntarily civilly committed in Alabama, seek to have three statutes[2] au-

---

[1]. Plaintiff Jean P. Lynch is presently incarcerated in Bryce Hospital pursuant to an involuntary commitment order. Leave to intervene was granted to Jesse M. Hughes, whose handwritten petition to this Court alleged that he was in imminent danger of being involuntarily committed by the Probate Judge of Clarke County. Although Mr. Hughes was released rather than committed upon the recommendation of the former Commissioner of Mental Health, Dr. Stonewall Stickney, intervening plaintiff believes that his "admittedly eccentric habits" render him continually vulnerable to involuntary commitment under Alabama's statutory procedures.

[2]. Ala.Code, tit. 15, § 432 (1958), provides: Any insane person who is at large and not under the control, restraint, or management of any person may be taken into custody or arrested by any officer or person and carried immediately to the probate judge of the county, who shall issue a mittimus or commitment of such insane person either to the county jail or the Alabama state hospitals until inquisition proceedings may be had as to such person so confined. Thereafter the person so confined shall abide by the decree or order of the inquisition proceedings. When such person is brought before the probate judge, if the judge shall be satisfied that the person brought before him is not insane, he may direct the discharge of such person from custody and arrest and decline to institute the proceedings of lunacy. But if the judge of probate be satisfied that such person is insane, or if he has a reasonable doubt as to his sanity, he shall have the person or persons so bringing the alleged insane person before him to institute the inquisition proceedings of lunacy as is now provided by law.

Ala.Code, tit. 45, § 208 (1958), provides in relevant part: When a relative, friend, or other party interested desires to place a person as a patient in one of the state hospitals, he shall apply to the judge of probate of the county in which the person resides, and the judge of probate, without delay, shall investigate the case, by examining witnesses, or not, as he sees fit, and, if he is reasonably convinced that the case is a suitable one, he shall make application to the superintendent at Tuscaloosa for his, or her admission, and shall accompany his appli-

thorizing involuntary commitment declared unconstitutional on their face and as applied and to have their enforcement enjoined.

This action arises under the Fourteenth Amendment to the Constitution of the United States. Plaintiffs invoke the jurisdiction of this Court pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3).

The defendants are the Attorney General of the State of Alabama; the Commissioner of the Department of Mental Health of the State of Alabama; and the Probate Judges of Montgomery County, Alabama, and Clarke County, Alabama, individually and as representatives of all other judges of.probate in the State of Alabama.

Because an injunction was sought against statutes of statewide application whose constitutionality was at issue, plaintiffs requested that a three-judge court be convened. A survey of the pertinent case law indicated that the complaint raised a substantial constitutional question, Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152, (1933), but that the defense of the constitutionality of the statutes was neither frivolous nor foreclosed by prior decisions of the United States Supreme Court, Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L. Ed.2d 512 (1962). Consequently, a three-judge court was constituted pursuant to the requirements of 28 U.S.C. §§ 2281 and 2284.

The case is submitted upon the pleadings, briefs, stipulations, and documentary evidence. All parties are in agreement that the Due Process Clause of the Fourteenth Amendment applies to

involuntary commitment proceedings, Specht v. Patterson, 386 U.S. 605, 608, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967); Donaldson v. O'Connor, 493 F.2d 507, 520 (5th Cir. 1974), and that certain minimal constitutional standards and safeguards must be observed throughout the commitment process. Whereas plaintiffs argue that the statutes in question are unconstitutional both on their face and as applied, defendants maintain that they are constitutional on their face but concede that they may have been applied unconstitutionally in some cases. There being substantial controversy concerning the specific minimal standards and safeguards mandated by the Due Process Clause, the parties in this case join in requesting this Court to determine those constitutionally required standards and safeguards.

## I.

From the pleadings and stipulations in this case, it appears that plaintiff Jean P. Lynch, a resident of Montgomery County, was arrested by the Montgomery County Sheriff's Department on November 2, 1973, pursuant to a warrant issued that date by the defendant Probate Judge of Montgomery County under the authority of Ala.Code, tit. 15, § 432 (1958). Said warrant was sworn out by one Theresa Lynch, daughter of the named plaintiff, who averred that plaintiff "is at large and not under the control, restraint or management of any person, and that she is not ̄able to restrain or manage said person, and that it is necessary for his [sic] own and the public good that she be restrained and an inquisition proceedings had to deter-

cation with as full and as explicit answers as possible to the following interrogatories describing the case . . . . .
Ala.Code, tit. 45, § 210 (1958), provides in relevant part:
When informed by the superintendent that the person can be received as a patient, the judge of probate shall examine witnesses, at least one of whom shall be a physician, and fully investigate the facts of the case. either with or without a jury, and either with or without the presence in

court of the person, the grade of whose mental disqualification is under investigation, according to his discretion; and if the judge, or the jury, as the case may be, believe that the person is sufficiently defective mentally to be sent as a patient to a hospital for insane persons, the judge of probate shall make two copies of a certificate of mental disqualification, one copy of which shall be filed in his office and the other he shall send with the patient to the hospital . . . . .

mine whether or not she should be committed to an insane hospital."

On the same day the warrant was issued, inquiry was made by the probate court[3] as to the availability of facilities at Bryce Hospital for the accommodation of plaintiff, who was at that time confined in the Montgomery County Jail. Also on the same day an order was issued by the probate judge directing the Sheriff to summon six (6) jurors at 2:00 p. m. that day to determine whether "the said Jean P. Lynch is so deficient mentally that she should be committed to an insane hospital." At the appointed time, a hearing was held, and the jury returned a verdict that plaintiff was "sufficiently defective mentally to be sent as a patient to a hospital for insane persons." It is undisputed that plaintiff was not present at the hearing, that she was not represented by counsel, and that she was not advised of any right to the presence of counsel and the appointment of counsel if indigent. On November 6, 1973, plaintiff was ordered committed to Bryce Hospital by the defendant Probate Judge of Montgomery County under the authority of Ala.Code, tit. 45, §§ 208 and 211. Plaintiff remains at this date an involuntary patient in Bryce Hospital.

The parties have entered into the following stipulations regarding the procedures ordinarily followed in the course of involuntary civil commitments in Alabama:

1. The individual who is the subject of the commitment proceeding is given no notice of hearing, is not present during the hearing, is not informed of his/her right to counsel, and is not appointed counsel if indigent.

2. The defendant Probate Judge of Montgomery County, as well as certain other judges of probate, empanels a jury composed of six (6) persons to determine if the subject of an involuntary commitment proceeding should be committed to a state mental hospital.

3. The defendant Probate Judge of Clarke County, as well as certain other judges of probate, does not empanel a jury in civil commitment proceedings.

4. The only standard which is charged to the jury (if there is a jury) and which is applied by the trier of fact (judge or jury) is that contained in Ala.Code, tit. 45, § 205:

A person shall be adjudged insane who has been found by a proper court sufficiently deficient or defective mentally to require that, for his own or others' welfare, he be moved to the insane hospital for restraint, care and treatment.

## II.

■■ This action is properly maintainable as a Rule 23(b)(2) class action because defendants are alleged to have taken action or refused to take action with respect to the plaintiff class as a whole, and final relief of an injunctive and a declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate. See Advisory Committee Note to Rule 23(b)(2). As a practical matter, it is immaterial that certain potential class members may be satisfied with their present status and indifferent as to the constitutionality of the statutes herein attacked. If the statutes are declared unconstitutional, all those similarly situated will be equally affected. The fact that each member of the class is subject to the same deprivation of constitutional rights as the representative parties is sufficient to fulfill the representation requirements of Rule 23(a)(3) and (4). Sullivan v. Houston Independent School District, 307 F.Supp. 1328, 1338 (S.D. Tex.1969). Thus, assuming, as the dissent does, that there may be members of the class who would not benefit by the *effect* of a declaration of the unconstitutionality of Alabama's civil commitment statutes, this is not determinative of

---

3. As required by Ala.Code, tit. 45, § 208 (1958).

plaintiffs' representative status. Davy v. Sullivan, 354 F.Supp. 1320, 1326 (M. D.Ala.1973).

### III.

This Court concludes from the evidence presented that the named plaintiff and members of the class she represents have been involuntarily civilly committed to Bryce and Searcy Hospitals as a result of proceedings and procedures which do not comport with the minimum requirements of the Due Process Clause of the Fourteenth Amendment. Specht v. Patterson, *supra*.

We further conclude and declare that Ala.Code, tit. 15, § 432 (1958), which provides for emergency detention in the county jail or state mental hospitals, and Ala.Code, tit. 45 § 210 (1958), which outlines certain procedures for involuntary commitment to such hospitals, are unconstitutional on their face because they purport to authorize *ex parte* and summary deprivation of liberty without any of the rudimentary protections long recognized as required by the due process of law. Unlike our dissenting brother, we find it unnecessary to reach the question of whether these particular statutes might be saved by excising from them certain constitutionally offensive words and phrases. On the contrary, we are compelled to hold each violative of the Fourteenth Amendment on account of the absence of the substantial procedural protections constitutionally required, as well as because of the offending provisions present in the statutes.

While recognizing that Ala. Code, tit. 45, § 208 (1958), like the other statutes herein attacked, may have been applied unconstitutionally on occasion, we perceive no facial infirmity with respect to Title 45, Section 208, nor anything constitutionally offensive with respect to the authority therein conferred upon the probate judges of Alabama.

### IV.

This Court shall now proceed to set forth those standards and safeguards which, at a minimum, the Due Process Clause requires for the protection of persons whose liberty is placed in jeopardy as a consequence of their becoming the subjects of civil commitment proceedings against their will.

Due to the wording of the commitment statutes in question and the practices and procedures followed by the probate judges of Alabama in involuntary commitment proceedings, all Alabama probate court commitments are to be presumed involuntary unless and until there has been a judicial determination in an adversary proceeding during which the person proposed to be committed is represented by counsel, that the commitment is in fact a voluntary one, knowingly and intelligently consented to by the person to be committed. In the absence of any such judicial determination, the commitment proceedings are involuntary as a matter of law and must comply with the following minimum standards:

### (A) *Emergency detention.*

It cannot be seriously doubted that the state may on occasion have a compelling interest in the emergency detention of those who threaten immediate and serious violence to themselves or others. Since the interests of these emergency detainees in retaining their liberty and avoiding unwarranted civil commitment are comparable to the interests of persons accused of criminal offenses in retaining their liberty and avoiding wrongful incarceration, the burden on the state to justify the emergency detention must be similarly heavy. As one means of assuring that persons accused of crimes are not held in custody and involuntarily deprived of their liberty without a showing of probable cause to believe that they have committed punishable offenses, it is generally required that such persons be brought before a judicial officer without unnecessary delay after arrest to determine whether they are being detained on probable cause. Rule 5, Federal Rules of Criminal Procedure; McNabb v. United

States, 318 U.S. 332, 343–344, 63 S.Ct. 608, 87 L.Ed. 819 (1943); Brown v. Fauntleroy, 143 U.S.App.D.C. 116, 442 F.2d 838, 839 (1971). Likewise, in the situation here, where a person said to be mentally ill and dangerous is involuntarily detained, he must be given a hearing within a reasonable time to test whether the detention is based upon probable cause to believe that confinement is necessary under constitutionally proper standards for commitment. In re Barnard, 147 U.S.App.D.C. 302, 455 F.2d 1370, 1374 (1971); Lessard v. Schmidt, 349 F.Supp. 1078, 1090–1091 (E.D.Wis.1972), vacated and remanded 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974); Fhagen v. Miller, 306 F. Supp. 634, 638 (S.D.N.Y.1969).

 Emergency detention without a hearing on its appropriateness and necessity can be justified only for the length of time required to arrange a probable cause hearing before the probate judge or other judicial officer empowered by law to commit persons to Alabama mental institutions. Lessard v. Schmidt, 349 F.Supp. at 1091. In no event may such detention in the absence of a probable cause hearing exceed seven (7) days from the date of the initial detention.

 Due process does not require that the probable cause hearing be characterized by the formality of the proceedings for final adjudication of commitment; neither does it require that each and every constitutional protection required in the subsequent proceedings be accorded. At the very least, however, due process does require that the hearing be preceded by adequate notice informing the person (or his counsel) of the factual grounds upon which the proposed commitment is predicated and the reasons for the necessity of confinement; that the person be represented by counsel, appointed if necessary; and that the person proposed to be committed be present at the hearing unless his presence is waived by counsel and

approved by the court after an adversary hearing at the conclusion of which the court judicially finds and determines that the detainee is so mentally or physically ill as to be incapable of attending the probable cause hearing.

 Just as emergency detention is justified only until a probable cause hearing can be conducted, temporary detention following a finding of probable cause to believe that confinement is necessary can be justified only for the length of time required to arrange a full hearing on the need for commitment. Due process requires that such hearing be held within a reasonable time following initial detention, but in no event sooner than will permit adequate preparation of the case by counsel or later than thirty (30) days from the date of the initial detention.

(B) *Formal commitment proceedings.*

 (1) *Notice.* Due process requires that notice be given of the hearing to be held on the necessity for commitment "sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded." In re Gault, 387 U.S. 1, 33, 87 S.Ct. 1428, 1446, 18 L.Ed.2d 527 (1967); Lessard v. Schmidt, 349 F. Supp. at 1092. Such notice should include the date, time, and place of the hearing; a clear statement of the purpose of the proceedings and the possible consequences to the subject thereof;[4] the alleged factual basis for the proposed commitment; and a statement of the legal standard upon which commitment is authorized.

 (2) *Presence of the person proposed to be committed.* Due process requires the presence of the person proposed to be involuntarily committed at all judicial proceedings conducted for that purpose, Specht v. Patterson, 386 U.S. at 610, 87 S.Ct. 1209, unless the right has been knowingly and intelligently waived by such person or by adversary counsel acting in his behalf and

---

4. Sarzen v. Gaughan, 489 F.2d 1076, 1084 (1st Cir. 1973).

for good cause shown. Waiver by the person to be committed in his own behalf is valid only upon acceptance by the court following a judicial determination that he understands his rights and is competent to waive them. Waiver by counsel in his client's behalf is valid only upon approval by the court after an adversary hearing at the conclusion of which the court judicially finds and determines that the person proposed to be committed is so mentally or physically ill as to be incapable of attending such proceedings.

The right to be present at the hearing necessarily includes the right to participate therein to the extent of the subject's ability. Due process is not accorded by a hearing in which the individual, though physically present, has no meaningful opportunity to participate because of incapacity caused by excessive or inappropriate medication. Lessard v. Schmidt, 349 F.Supp. at 1092.

(3) *Right to counsel.* The subject of an involuntary civil commitment proceeding has the right to the effective assistance of counsel at all significant stages[5] of the commitment process. Heryford v. Parker, 396 F.2d 393, 396 (10th Cir. 1968); Lessard v. Schmidt, 349 F.Supp. at 1099; Dixon v. Attorney General of Commonwealth of Pennsylvania, 325 F.Supp. 966, 974 (M. D.Pa.1971). Further, he has the right to be advised of his right to counsel, In re Gault, 387 U.S. at 42, 87 S.Ct. 1428, and to the appointment of counsel if indigent. Lessard v. Schmidt, 349 F.Supp. at 1097; Dixon v. Attorney General, 325 F.Supp. at 974. Counsel must be made available far enough in advance of the final commitment hearing to ensure adequate opportunity for preparation. In order to aid counsel in the effective pre-sentation of his client's interests, the names of the examining physicians and all others who may testify in support of the petition to commit must be made available to counsel in advance of the hearing, and he must be afforded a reasonable opportunity to inspect any documents and records pertaining to the case. Sarzen v. Gaughan, 489 F.2d at 1085, 1086.

The right to counsel is a right to representative counsel occupying a traditional adversarial role. Where state law requires or permits the appointment of a guardian *ad litem*, such appointment shall be deemed to satisfy the constitutional right to counsel if, but only if, the appointed guardian is a licensed attorney and occupies a truly adversary position. To the extent that these conditions are fulfilled, this Court perceives no difference between a guardian *ad litem* and other appointed counsel.

(4) *Requisite findings to support an order of commitment.* It has long been recognized in this country that the involuntary confinement of the mentally ill is justified only under certain specific circumstances where conduct is threatened with which the state has the obligation to deal:

[T]he right to restrain an insane person of his liberty is found in that great law of humanity, which makes it necessary to confine those whose going at large would be dangerous to themselves or others . . . And the necessity which creates the law, creates the limitation of the law. The questions must then arise in each particular case, whether a patient's own safety, or that of others, requires that he should be restrained for a certain time, and whether restraint is neces-

---

5. By "significant stages" we should be understood to mean all judicial proceedings and any other official proceedings at which a decision is, or can be, made which may result in a detrimental change in the conditions of the subject's liberty. The right to counsel does not, however, extend to preliminary information-gathering stages, such as psychiatric interviews, where custodial decisions are not made. It is generally agreed that the examination stage is most effectively conducted according to the directions of the examining physician and that the presence of counsel, unless specifically invited by the physician, might unduly interfere with the objective evaluation of the patient's mental condition. Lessard v. Schmidt, 349 F.Supp. at 1100.

sary for his restoration or will be conducive thereto. The restraint can continue as long as the necessity continues. This is the limitation, and the proper limitation.

Matter of Josiah Oakes, 8 Law Rep. 123, 125 (Supreme Judicial Court of Massachusetts, 1845).

■ Like the Massachusetts Court —and more recently—the Supreme Court of the United States has indicated that the "massive curtailment of liberty," Humphrey v. Cady, 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), occasioned by involuntary civil commitment is permissible only in those situations in which threatened or actual behavior is of a nature which the state may legitimately control: specifically, where the conduct resulting from mental illness poses a serious threat of substantial harm to self or to others. In Humphrey v. Cady, the court interpreted a Wisconsin statute authorizing involuntary civil commitment of a "proper subject for custody and treatment" as requiring a "social and legal judgment that [the mentally ill individual's] potential for doing harm, to himself or to others, is great enough to justify such a massive curtailment of liberty." *Id.* And in Jackson v. Indiana, 406 U.S. 715, 728, 92 S.Ct. 1845, 1853, 32 L.Ed.2d 435 (1972), the court construed a statute authorizing detention "in the interest of the welfare of such person or . . . others . . ." to require an inde-

pendent showing of dangerousness. See also Donaldson v. O'Connor,[6] 493 F.2d 507, 520 (5th Cir. 1974).

■ Because the power of the state to curtail the liberty of a citizen not convicted of a crime, but believed to be suffering from a mental illness, is thus limited, it must follow that an involuntary commitment order must be based upon specific findings sufficient to bring the subject of the proceedings within the limited sphere of legitimate governmental concern. Accordingly, each order of involuntary commitment shall be supported by the following minimum findings made by the fact-finder upon the basis of the evidence introduced at the commitment hearing:

(a) The person to be committed is mentally ill.[7]

(b) The person to be committed poses a real and present threat of substantial harm to himself or to others. Dixon v. Attorney General, 325 F.Supp. at 974.

■ Although dangerousness to self and dangerousness to others are frequently considered together, it is clear that they actually represent quite different state interests. Commitment on account of dangerousness to others serves the police power, while commitment for dangerousness to self partakes of the *parens patriae* notion that the state is the ultimate guardian of those of its citizens who are incapable of caring for their own interests. See In re

6. In Donaldson v. O'Connor, a former patient who had been involuntarily civilly committed to a Florida mental hospital sued the attending physicians and others for deprivation of his alleged constitutional right to receive treatment or be released from the hospital. The court held that "where, as in Donaldson's case, the rationale for confinement is the '*parens patriae*' rationale that the patient is in need of treatment, the due process clause requires that minimally adequate treatment be in fact provided." 493 F.2d at 521. Because Donaldson did not raise the issue of the constitutional validity *ab initio* of the involuntary commitment of a *nondangerous* person for treatment or custodial purposes, we do not interpret the holding in that case to sanction the commitment of a nondangerous person against his

will. *Cf.* Millard v. Harris, 132 U.S.App. D.C. 146, 406 F.2d 964, 973 (1968). Rather, we believe that *Donaldson* must be read as deciding the quite different question of the minimum standards of treatment constitutionally required for the cure or improvement of a person previously confined to a mental hospital ostensibly for the purpose of treatment and not for restraint.

7. This requirement may be implicit in the present Alabama civil commitment procedure, for Ala.Code, tit. 45, § 204 (1958) provides that Bryce and Searcy Hospitals shall be maintained and used exclusively for the care, treatment, and custody of patients "committed to them as insane by a proper court."

Ballay, 157 U.S.App.D.C. 59, 482 F.2d 648, 658 (1973). Valid exercise of the *parens patriae* power presumes an incapability to manage one's affairs that approximates, if it is not identical with, legal incompetence to act. Consequently, in order to deprive a person alleged to be a danger to himself alone of the right to choose between treatment and liberty, the state must first demonstrate that, because of his mental illness, he lacks the capacity to weigh for himself the risks of freedom and the benefits of hospitalization.

A finding of dangerousness indicates the likelihood that the person to be committed will inflict serious harm on himself or on others. In the case of dangerousness to others, this threat of harm comprehends the positive infliction of injury—ordinarily physical injury, but possibly emotional injury as well. In the case of dangerousness to self, both the threat of physical injury and discernible physical neglect may warrant a finding of dangerousness. Although he does not threaten actual violence to himself, a person may be properly commitable under the dangerousness standard if it can be shown that he is mentally ill, that his mental illness manifests itself in neglect or refusal to care for himself, that such neglect or refusal poses a real and present threat of substantial harm to his well-being, and that he is incompetent to determine for himself whether treatment for his mental illness would be desirable.

(c) The danger posed by the person to be committed has been evidenced by a recent overt act. Due process requires that the need for confinement be based upon a substantial likelihood that dangerous behavior will be engaged in unless restraints are applied. While the actual assessment of the likelihood of danger calls for an exercise of medical judgment,[8] the sufficiency of the evidence to support such a determination is fundamentally a legal question. A mere expectancy that danger-productive behavior might be engaged in does not rise to the level of legal significance when the consequence of such an evaluation is involuntary confinement. To confine a citizen against his will because he is likely to be dangerous in the future, it must be shown that he has actually been dangerous in the recent past and that such danger was manifested by an overt act, attempt or threat to do substantial harm to himself or to another. Lessard v. Schmidt, 349 F.Supp. at 1093; Cross v. Harris, 135 U.S.App.D.C. 259, 418 F.2d 1095, 1102 (1969); cf. Millard v. Harris, 406 F.2d at 973.

(d) There is treatment available for the illness diagnosed. Because patients involuntarily committed through non-criminal proceedings "unquestionably have a constitutional right to receive such individual treatment as will give each of them a realistic opportunity to be cured or to improve his or her mental condition," Wyatt v. Stickney, 325 F. Supp. 781, 784 (M.D.Ala.1971), affirmed sub nom., Wyatt v. Aderholt, 503 F.2d 1305, No. 72–2634 (5th Cir. 1974);[9] Donaldson v. O'Connor, 493 F.2d 507, 527 (5th Cir. 1974), the fact-finder must ascertain the existence and availability of a treatment program for the illness suffered by the person whose commitment is sought.

An exception to this general requirement of due process is recognized in the case of a presently and seriously dangerous person for whose illness there is no

---

8. Not only is mental illness itself an elusive concept to define and difficult to diagnose with precision, but the need for confinement in a given case is a determination about which psychiatrists often disagree. One explanation for this is that psychiatrists, like most other people, have wide differences of opinion about which sorts of danger justify incarceration and which do not.

9. All of those portions of the district court's orders concerning the constitutional right to treatment were affirmed by the Fifth Circuit; certain portions of the order relating to possible methods of financing the cost of securing these rights were remanded for possible future consideration by a court of three judges.

known cure or treatment. In such instances, the state may well have an obligation under the police power to restrain the liberty of the threatening individual, even though his condition is not amenable to any currently available treatment. Since the involuntary commitment of an untreatable person is an exception to the general due process requirement that treatment be available and afforded, the committing court must make a finding, based upon clear and convincing evidence, that confinement even without a proposed treatment program is necessary for the safety and well-being of the community and of the person to be committed. Such orders of commitment, when granted, shall provide that, should treatment for the patient's illness become available at any time during the period of his confinement, such treatment shall be made available to him immediately.

■ (5) *The proposed commitment is the least restrictive alternative necessary and available for the person's illness.* In addition to the findings which are required to be made by the fact-finder, the state, acting through the probate court or whichever of its agents designates the place of confinement, shall have the burden of demonstrating that the proposed commitment is to the least restrictive environment consistent with the needs of the person to be committed.[10] Welsch v. Likins, 373 F. Supp. 487, 502 (D.Minn.1974); cf., Covington v. Harris, 136 U.S.App.D.C. 35, 419 F.2d 617, 623 (1969); Wyatt v. Stickney, 344 F.Supp. 373, 379 (M.D. Ala.1972), affirmed sub nom., Wyatt v. Aderholt, 503 F.2d 1305, No. 72–2634 (5th Cir. 1974). This duty of investigation and burden of persuasion derive

from the general and well-recognized principle that " . . . even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960).

Specifically, the state, which knows or has the means of knowing the available alternatives, must bear the burden of proving what alternatives are available, what alternatives were investigated, and why the investigated alternatives were not deemed suitable. Lessard v. Schmidt, 349 F.Supp. at 1096.

■ Moreover, it should be pointed out that due process does not preclude, and indeed may require, commitment of a person suffering from a mental illness to an environment other than full-time confinement in Bryce or Searcy Hospital. Possible alternatives include voluntary or court-ordered out-patient treatment, day treatment in the hospital, night treatment in the hospital, placement in a private hospital, placement in the custody of a willing and responsible relative or friend, placement in a nursing home, referral to a community health clinic, home health aide services, and prescribed medication.

(6) *Standard of proof.* The standard of proof required to be adduced in an adjudicatory proceeding is "the kind of question which has traditionally been left to the judiciary to resolve . . . ." Woodby v. Immigration Service, 385 U.S. 276, 284, 87 S.Ct. 483, 487, 17 L.Ed.2d 362 (1966). Its function, as pointed out by Mr. Justice Harlan, concurring in In re Winship, is "to

10. The Supreme Court of the United States has rejected as not constituting a substantial federal question the claim that the less drastic means (or least restrictive alternative) principle applies to the civil commitment process as a matter of constitutional right. Sanchez v. New Mexico, 396 U.S. 276, 90 S. Ct. 588, 24 L.Ed.2d 469 (1970), dismissing for want of substantial federal question, 80 N.M. 438, 457 P.2d 370 (1968). In view of

the disposition of *Sanchez*, the least restrictive alternative requirement may not raise a substantial constitutional question. However, because of the manner of the submission of this case and the request of the parties that this Court promulgate minimum standards for involuntary civil commitment, we consider this question to be an integral part of the case as submitted.

instruct the fact-finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." 397 U.S. 358, 370, 90 S. Ct. 1068, 1076, 25 L.Ed.2d 368 (1970). It is "more than an empty semantic exercise; it reflects the value society places on individual liberty." Tippett v. State of Maryland, 436 F.2d 1153, 1166 (4th Cir. 1971), Sobeloff, J., concurring in part and dissenting in part, cert. dismissed as improvidently granted, sub nom. Murel v. Baltimore City Criminal Court, 407 U.S. 355, 92 S.Ct. 2091, 32 L.Ed.2d 791 (1972).

The degree of confidence demanded of any judicial determination reflects in part the *significance of the interests* to be affected thereby. It cannot be doubted that the interests of those facing civil commitment proceedings are of the most serious nature:

> The destruction of an individual's personal freedoms effected by civil commitment is scarcely less total than that effected by confinement in a penitentiary. Indeed, civil commitment, because it is for an indefinite term, may in some ways involve a more serious abridgement of personal freedom than imprisonment for commission of a crime usually does. Civil commitment involves stigmatizing the affect-

ed individuals, and the stigma attached, though in theory less severe than the stigma attached to criminal conviction, may in reality be as severe, or more so.[11]

Donaldson v. O'Connor, 493 F.2d 507, 520 (5th Cir. 1974).

Because the stigmatization and loss of liberty attendant upon forced confinement are of the most profound consequence to the individual affected, due process demands that he be subjected to such disabilities only if the necessity for his commitment is proved by evidence having the highest degree of certitude reasonably attainable in view of the nature of the matter at issue. In a civil commitment proceeding, the questions involved are the primarily subjective ones of the subject's mental condition and the likelihood that he will be dangerous in the future. Such subjective determinations cannot ordinarily be made with the same degree of certainty that might be achieved where purely objective facts and occurrences are at issue. Consequently, the trier of fact must be persuaded by clear, unequivocal, and convincing evidence that the subject of the hearing is in need of confinement under the minimum standards for commitment herein enumerated. No greater margin for error can be tolerated as to either the underlying facts or the ultimate conclusion.[12] Tippett v. State of

---

11. Persons committed to state mental hospitals may not constitutionally be subjected to a number of legal disabilities solely on account of commitment, among which are included denial of the right to contract, to marry, to vote, and to hold a professional license [but see Ala.Code, tit. 46, § 189(12) (1958), authorizing the Alabama board of nurses' examiners and registration to revoke a certificate of registration for, *inter alia*, "mental incapacity"]. Wyatt v. Stickney, 344 F.Supp. at 379.

12. We reject defendants' assertion that the preponderance of the evidence standard is controlling, with the observation that a civil commitment proceeding, where liberty is at stake, is significantly different from the usual civil proceeding where the stakes are ordinarily economic and where "we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous ver-

dict in the plaintiff's favor." In re Winship, 397 U.S. at 371, 90 S.Ct. at 1076; Woodby v. Immigration Service, *supra*.

We also reject as demanding a degree of proof virtually unattainable at this stage in the development of psychiatric medicine plaintiffs' contention that due process requires proof beyond a reasonable doubt. While we agree in principle with the conclusion in In re Winship that proof beyond a reasonable doubt is constitutionally necessary where interests of "immense importance" are at stake, 387 U.S. at 363, 90 S. Ct. 1068, we nevertheless find that reasoning inapplicable to a situation such as this where the ultimate determination of the need for commitment must of necessity be based upon subjective conclusions and predictions, albeit derived from underlying objective facts. *Contra*: In re Ballay, 157 U.S.App.D.C. 59, 482 F.2d 648; Lessard v. Schmidt, 349 F.Supp. at 1095.

394

Maryland, *supra,* 436 F.2d at 1165–1166 (Sobeloff, J.); Dixon v. Attorney General, 325 F.Supp. at 974.

■ (7) *Conduct of the commitment hearing.* Due process requires that the subject of an involuntary commitment proceeding, whether civil or criminal, be given the opportunity to offer evidence in his own behalf. Specht v. Patterson, 386 U.S. at 610, 87 S.Ct. 1209. "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense . . . This right is a fundamental element of due process of law." Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967).

■ Due process likewise requires that the subject of a commitment hearing have the opportunity to be confronted with and to cross-examine the witnesses testifying in support of commitment. Specht v. Patterson, 386 U.S. at 610, 87 S.Ct. 1209; Millard v. Harris, 406 F.2d at 973. Holding the commitment hearing in the absence of the person proposed to be committed shall not be deemed an abridgement of his rights of confrontation and cross-examination if, but only if, there has been a prior judicial determination, after an adversary hearing at which he was represented by counsel, that he is so mentally or physically ill as to be incapable of attending the hearing.

■ The privilege against self-incrimination, which can be claimed "in any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory," Murphy v. Waterfront Commission, 378 U.S. 52, 94, 84 S.Ct. 1594, 1611, 12 L.Ed.2d 678 (1964), White, J., concurring; In re Gault, 387 U.S. at 49–50, 87 S.Ct. 1428, is fully applicable at all stages of the civil commitment process, including the psychiatric interviews. See Millard v. Harris, 406

F.2d at 973. It protects any disclosures which the subject may reasonably believe could be used in a criminal prosecution or which could lead to other evidence that might be so used. Murphy v. Waterfront Commission, *supra.*

■ As we have noted repeatedly, the gravity of the consequences flowing from adjudication of the need for commitment compels the application of procedural safeguards comparable in most instances to those required in criminal proceedings. At the very least, due process requires that the rules of evidence applicable to other judicial proceedings be followed in involuntary commitment proceedings.[13] Lessard v. Schmidt, 349 F.Supp. at 1103. In particular, if hearsay evidence would be excluded from other proceedings, it should be excluded from commitment hearings as well.[14] See In re Gault, 387 U.S. at 11, n. 7, 87 S.Ct. 1428.

(8) *Trial by jury.* It has been generally assumed that there is no common law right to trial by jury in traditionally equitable probate court proceedings. McKeiver v. Pennsylvania, 403 U.S. 528, 543, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971); Hanks v. Hanks, 281 Ala. 92, 97, 199 So.2d 169 (1967); Ex parte Floyd, 250 Ala. 154, 33 So.2d 340 (1948). Moreover, the Supreme Court of the United States has held that trial by jury is neither a necessary element of the "fundamental fairness" guaranteed litigants by the Due Process Clause, nor an essential component of accurate fact-finding. McKeiver v. Pennsylvania, *supra.* Plaintiffs have cited no case, and independent research has disclosed no case, holding that trial by jury is constitutionally required in civil commitment proceedings.

■ Although there may be no such constitutional right, we believe that in most, if not all, instances a jury is desirable. Involuntary confinement is premised

13. This requirement is embodied in Ala.Code, tit. 13, § 309 (1958).

14. Hearsay evidence has been held inadmissible in Alabama lunacy inquisitions instituted

under Ala.Code, tit. 21, § 16 et seq. (1940). Jones v. Jones, 275 Ala. 678, 158 So.2d 481, 486 (1963).

. . . not solely on the medical judgment that the defendant is mentally ill and treatable, but also on the social and legal judgment that his potential for doing harm, to himself or to others, is great enough to justify such a massive curtailment of liberty. In making this determination, the jury serves the critical function of introducing into the process a lay judgment, reflecting values generally held in the community, concerning the kinds of potential harm that justify the State in confining a person for compulsory treatment.

Humphrey v. Cady, 405 U.S. at 509, 92 S.Ct. at 1052.

██ It is not enough, however, to say that the right to trial by jury is not in itself an absolute constitutional right. That argument was emphatically rejected by the Supreme Court when it said that the question of whether

. . . summarily denying Rachel Brawner access to the site of her former employment violated the requirements of the Due Process Clause of the Fifth Amendment . . . cannot be answered by easy assertion that, because she had no constitutional right to be there in the first place, she was not deprived of liberty or property by the Superintendent's action. "One may not have a constitutional right to go to Baghdad, but the Government may not prohibit one from going there unless by means consonant with due process of law."

Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 894, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961), quoting Homer v. Richmond, 110 U.S.App. D.C. 226, 229, 292 F.2d 719, 722 (1961); Dixon v. Alabama State Board of Education, 294 F.2d 150, 156 (5th Cir. 1961). To the extent, then, that Ala.Code, tit.

45, § 210 (1958) [15] permits the exercise of an unbridled discretion by the probate judge in determining whether to empanel or not to empanel a jury, the statute violates the Due Process Clause of the Fourteenth Amendment.

 There is a statutory right to trial by jury on the demand of a person *confined* as insane who prosecutes a writ of habeas corpus to determine the issue of his sanity. Ala.Code, tit. 15, § 3 (1958); Phillips v. Giles, 287 Ala. 469, 475, 252 So.2d 624, 629 (1971). The State of Alabama, having thus granted the right in some cases, may not deny it in others except on the basis of a rational distinction. Humphrey v. Cady, 405 U.S. at 512, 92 S.Ct. 1048; Baxstrom v. Herold, 383 U.S. 107, 110–111, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966); Gomez v. Miller, 337 F.Supp. 386, 391 (S.D.N.Y. 1971). We can perceive no rational basis upon which the state can predicate a decision to grant jury determinations as of right to persons already deprived of their liberty, stigmatized by institutionalization, and removed from their relationships in the community, while denying the same right to persons whose continued freedom, good name, and ongoing associations are at stake. We, therefore, hold that basing the right to a jury determination of the need for commitment on the essentially irrelevant factor of present confinement violates the Equal Protection Clause of the Fourteenth Amendment.

██ We further hold that, if juries are used in civil commitment proceedings, equal protection requires that all commitment juries throughout the state perform the same function: if the jury is the fact-finder in some jurisdictions, it must be the fact-finder in all jurisdictions.[16]

---

15. "When informed by the superintendent that the person can be received as a patient, the judge of probate shall examine witnesses . . . and fully investigate the facts of the case, *either with or without a jury . . . according to his discretion . . .*" (emphasis added).

16. Ala.Code, tit. 45, § 205 (1958) might be construed to require that all commitment juries perform a merely advisory function: "Whether the person's mental abnormality is sufficiently grave to warrant such procedure is always the question to be decided by the court." See O'Barr v. Feist, 292 Ala. 440,

Plaintiffs maintain that a jury of twelve persons is constitutionally required. It is well settled that, as far as the Sixth Amendment is concerned, the states are left free to prescribe the precise number that shall constitute a jury. Williams v. Florida, 399 U.S. 78, 103, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). Similarly, in the context of the Seventh Amendment, the Supreme Court has declined to hold that twelve members is a substantive aspect of the right to trial by jury. Colgrove v. Battin, 413 U.S. 149, 157, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973). A claim of the right to a jury of twelve is equally unavailing under Section 11 of the Alabama Constitution of 1901,[17] for the Supreme Court of Alabama has recently indicated that a jury composed of six members "would be clearly constitutional" if the right to trial by jury exists, as in this situation,[18] solely by legislative grace. Gilbreath v. Wallace, 292 Ala. 267, 292 So.2d 651, 652 (1974).

(9) *Record of proceedings.* A full record of the commitment proceedings, including findings adequate for review, shall be compiled and maintained by the probate court. Specht v. Patterson, 386 U.S. at 610, 87 S.Ct. 1209.

(10) *Waiver of rights.* The knowing and intelligent waiver of constitutional safeguards required in involuntary commitment proceedings is acceptable, provided that the waiver is made by counsel with the informed consent of the subject and with the approval of the court. When a waiver is proposed by counsel, but the subject is deemed incapable of giving his informed consent after appropriate inquiry and finding of facts, the court may approve such waiver for good cause shown.[19]

Finally, we wish to emphasize that our purpose is not to impose unnecessary restrictions or procedural requirements upon the authorities charged with the care and treatment of Alabama's mentally ill. It is not our intention that the treatment of any mentally ill resident of Alabama's mental institutions be disrupted. And, contrary to the assumption made by our dissenting brother, we neither contemplate nor order that the state release from its care and custody any persons presently confined in state mental hospitals who are unable to care and provide for themselves. Such persons over whom the state has heretofore assumed a significant custodial relationship, but who are not proper subjects for commitment to state mental hospitals under the standards herein set forth, shall be permitted to remain where they are presently confined if they so choose after being informed of the available alternatives.

---

296 So.2d 152, 160 (1974); Perkins v. United States Fidelity and Guaranty Company, 433 F.2d 1303, 1305 (5th Cir. 1970). This question not being before us, we decline to speculate as to the effect of this statute on the equal protection issue herein considered, except to say that the Equal Protection Clause is not implicated if all juries are advisory only.

17. "The right of trial by jury shall remain inviolate."

18. The right of trial by jury "exists solely by legislative grace," within the meaning of Section 11 of the Alabama Constitution, if it did not exist as a matter of common law right at the time of the adoption of the first state constitution in 1819 or by way of statute at the time of the adoption of the 1901 Constitution. Gilbreath v. Wallace, *supra*, at 653. As noted, no common law right of trial by jury has ever existed in Alabama

civil commitment proceedings. At the time of the adoption of the 1901 Constitution, the only statutory provision for trial by jury was a permissive one, similar in all important respects to the present statute [Ala. Code, tit. 45, § 210 (1958)], authorizing the probate judge to empanel or not to empanel a jury "according to his discretion." Code of 1897, Ch. 62, § 2553.

19. "Any mental or physical condition of a client that renders him incapable of making a considered judgment on his own behalf casts additional responsibilities upon his lawyer . . . . If the client is capable of understanding the matter in question or of contributing to the advancement of his interests, regardless of whether he is legally disqualified from performing certain *acts*, the lawyer should obtain from him all possible aid." Ethical Consideration 7–12, Canon 7, Code of Professional Responsibility.

Those patients not electing to remain and unable by reason of their physical or mental condition to be released from care entirely shall be transferred to custodial facilities appropriate for the care and treatment of their particular infirmities.[20]

The evidence presented to the Court in this case reflects, as we have herein outlined, that several thousand Alabama citizens are now suffering a "massive curtailment of liberty" by confinement in the state's mental institutions pursuant to court proceedings that were conducted and decrees that were entered in flagrant disregard of the substantial constitutional rights of those committed and now confined. We do, therefore, require, first, that all future involuntary commitments to any of Alabama's mental institutions fully comport with the requirements of procedural and substantive due process and, second, that all patients previously committed in violation of their constitutional rights and who remain committed in Alabama's mental institutions either: (a) be released therefrom; (b) be permitted to remain if they so choose and if they are incapable of caring for themselves; (c) be transferred to appropriate facilities designed for the care and treatment of their particular infirmities; or (d) be afforded, in accordance with the requirements of this opinion and the order to be entered herein, new hearings at-

tended by the full panoply of constitutional rights to which these citizens were initially entitled but of which they were deprived.

A formal judgment will be entered accordingly.

VARNER, District Judge (dissenting):

Differing from parts of the opinion of the majority of this Court, I respectfully dissent from several aspects thereof.

I am gravely concerned that the majority opinion would strip the State of any functional statute for commitment of any but the criminally insane[1] and would force the release of some persons dangerous to themselves or others. It is inconceivable to me that the Legislature intended to leave this State without a legally sufficient procedure for committing the needy insane or the dangerous insane.[2] I would, therefore, construe as facially constitutional that part of the commitment statutes which are not constitutionally inappropriate for the purpose of allowing commitment of insane persons and hold void only those parts thereof which are clearly constitutionally offensive.

Approaching the question of severability of the constitutionally offensive clauses of the questioned statutes, the test is whether or not the statute, absent the offensive portions, can be so applied as to accomplish the legislative purpose.[3]

---

20. "Allied institutions," not the state's mental hospitals, are the proper facilities for the care and treatment of "inebriates, epileptics, harmless dements, the feeble-minded and the like . . ." Ala.Code, tit. 45, § 190 (1958). Nursing homes are statutorily recognized as the appropriate institutions for the care and treatment of aged persons who "require primary treatment for their geriatric infirmities." Ala.Code, tit. 22, § 320(5) (1965).

1. Criminally insane persons are generally defined as persons who, because of deficient or defective mentality, are unable to determine right from wrong or, being able to so determine, are unable to refrain from doing wrong.

2. However, the Alabama Legislature has limited commitment to insane hospitals in Ala-

bama by the provisions of Title 45, § 205, to patients who "are sufficiently deficient or defective mentally to require that, for his own or others' welfare, he be moved to the insane hospital for restraint, care and treatment." Irrespective of constitutional requirements, patients not in need of treatment may not be committed under the Alabama civil statute.

3. If the objectionable parts of a statute are severable from the rest in such a way that the Legislature would be presumed to have enacted the valid portion without the invalid, the statute may be enforced as to those portions of it which are constitutional. Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434; Champlin Ref. Co. v. Corporation Com., 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062. If, after severing the constitu-

I conceive Alabama Code, Title 45, § 208, as being facially constitutional except for the phrase "or not, as he sees fit," allowing the judge to determine suitability of a subject for application to an insane hospital either by examining witnesses or not without any standards governing the exercise of his discretion. This phrase, in my judgment, offends the Equal Protection Clause of the Constitution, but it may be stricken from the statute without doing violence to the obvious legislative intent.

To the extent that Alabama Code, Title 45, § 210, contemplates commitment after inquisition proceedings conducted pursuant to constitutionally appropriate inquisition statutes, I find it not constitutionally offensive. However, to the extent that it allows the Probate Court to grant or deny the right of confrontation and to grant or deny a jury hearing " * * * either with or without a jury, and either with or without the presence in court of the person * * * ", I agree with the majority that it is offensive to the "equal protection" clause of the Constitution. Abolition of this phrase would not do violence to the legislative intent. The above quoted phrase should, therefore, be stricken, and I agree that the right to a jury and to be present at the hearing must be preserved to the extent provided by the opinion of the majority.

Title 15, § 432, gives considerable difficulty in that the first sentence thereof seems to imply that any officer or person is qualified to make the initial decision that a subject is insane. Secondly, the first sentence, by the use of the verb "shall issue", seems to imply that the probate judge has a statutory mandate to immediately issue the preliminary commitment. A reading of the third and fourth sentences of the section, however,

demonstrates that the judge of probate is not obligated to issue a commitment unless he has reasonable doubt as to the sanity of the subject. I suggest that the distinction between the requirement for temporary commitment to jail in a criminal case—"probable cause to believe"—and the requirement for temporary commitment of an allegedly insane person—"a reasonable doubt as to his sanity"—is justified by the fact that the State interest in the insanity case involves the safety of the subject as well as the public interest. This, I think, is a reasonable basis for the distinction. The standard "a reasonable doubt of his sanity" is comparable to the standard for continued commission of the insane convicted criminal whose sentence is about to expire (18 U.S.C. § 4247) if his release "will probably endanger the safety of the officers, the property, or other interests of the United States." See Jackson v. Indiana, 406 U.S. 715, 732, 92 S. Ct. 1845, 32 L.Ed.2d 435; Greenwood v. United States, 350 U.S. 366, 373–374, 76 S.Ct. 410, 100 L.Ed. 412. Presumably, the decision (reasonable doubt as to sanity) should be made in a constitutional manner, the statute itself not directing otherwise. The obvious import of the first part of the first sentence is that, where reasonable cause appears to believe that an insane person is at large and not under the control, restraint or management of any person, he may be taken into custody by any person and carried immediately to the probate judge of the county who, after due consideration of the matter as provided by the Constitution (if he finds from competent evidence a reason to doubt sanity, that is, a reasonable ground to believe the subject to be insane), may temporarily commit the person and ultimately institute inquisition proceedings of lunacy as otherwise provided by law.[4]

---

tionally offensive legislation, sufficient remains to effect the legislative purpose, only the offensive portions should be rejected. There is nothing in the rule of severability which prevents the severance and elimination not only of words, clauses or sentences, but also of whole sections of laws. See 16 Am. Jur.2d, Constitutional Law, § 181, et seq.

4. The constitutionality of the statutes in question should be considered in the light cast thereon by related statutes of which the constitutionality is not here in question. The inquisition proceedings of lunacy as "is now provided by law" referred to in § 432 are not here attacked. They are set out for civil inquisitions in Title 21, §§ 10–15, and

The standard of proof required by the section is not specifically designated by the term "satisfied" so, if there is a constitutional requirement as to the standard of proof, that standard should be applied by judges of probate committing pursuant to the statute.

Thus stripped of constitutionally offensive phrases, the statutes in question should be found constitutional in my opinion.

PRETRIAL RIGHT TO LIST OF WITNESSES: I dissent from the conclusion of my brothers that the right to counsel involves the furnishing of a list of the names and addresses of witnesses to be used. I know of no constitutional requisite, and I find none satisfactory to my mind in Sarzen v. Gaughan, 489 F.2d 1076, 1085, 1086, cited therefor by the majority, that a defendant, either in a criminal case or a civil commitment, be furnished a list of the names of witnesses who will testify against him. The knowledge that such a list would be furnished to certain dangerous insane persons might well decrease the number of examining physicians and others who would be willing to testify and might endanger the lives of any persons willing to testify against dangerous insane persons.

STANDARD FOR COMMITMENT— DANGER AND AVAILABLE TREATMENT: I concur, for other reasons than those mentioned by the majority, with the language stating that a subject must be both dangerous and subject to treatment before he may be committed.

I think those limitations are statutory rather than constitutional. The Alabama statute, Title 45, § 205, limits admission to State insane hospitals to those sufficiently deficient or defective mentally to require that, for his own or others' welfare, he be moved to the insane hospital for restraint, care and treatment. The Supreme Court in Jackson v. Indiana, supra, 406 U.S. at 728, 92 S.Ct. at 1853 found that a similarly worded statute providing detention "in the interest of the welfare of such person or . . . others", requires a showing of danger to that welfare. The Alabama statute requires proof of danger and availability of treatment, but I hesitate to say that those are constitutional requisites as I think the majority implies.

I question that the direct quotations from Humphrey v. Cady, 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), and Donaldson v. O'Connor, 493 F.2d 507, 520 (5th Cir. 1974), necessarily mean that, in order that a person may constitutionally be committed civilly for his insanity, he must be dangerous to others or that he must be subject to treatment.[5]

It seems to me that, what the cases generally say is that, before one's rights to liberty may be infringed either by a civil or a criminal commitment, there must be a controlling State interest which requires subversion of the subject's interest in his liberty. This controlling State interest may be any one of several things, such as the desirability of punishing a criminal or setting an example for other potential crimi-

---

for criminal inquisitions in Title 15, §§ 426–430. Title 21, § 11, prescribes a maximum period of 30 days between the filing of the proceeding and the date for the inquisition. Section 11 also requires appointment of a guardian ad litem, and Section 12 provides for issuance of a writ directing the sheriff to take the subject and, "if consistent with his health or safety, have him present at the place of trial". While this inquisition primarily contemplates determination civilly of the need for a guardian, it provides a jurisdiction and a format for inquisition proceed-

ings not necessarily limited to guardianship matters. Those sections may, in my opinion, be construed to implement § 432 so as to provide a method for constitutional commitments.

5. As hereinafter discussed, some language in *Donaldson* does, in fact, say exactly that, but other language seems to limit those words to the facts of *Donaldson* in the light of words of the statute under which Donaldson was committed, "for restraint, care and treatment". Code of Alabama, Title 45, § 205.

nals, the desirability of restraining a person who may be dangerous to himself or to others so that he may not harm the possible victim, the desirability of providing care, treatment or training for those who, because of insanity or mental illness, are unable to form a valid opinion or consent to custodial care or treatment. The cases seem uniformly to agree that, if the basis of the State's interest (the quid pro quo as it is sometimes referred to) terminates, then the basis for the commitment terminates, and the subject must be released unless another basis for commitment is recognized by another judicial determination.

In the case of Jackson v. Indiana, supra, 406 U.S. at 720–722, 92 S.Ct. at 1850, the Court implicitly expresses approval of the Indiana statute for commitment of the feeble-minded pursuant to the quid pro quo—referring to:

"\* \* \* the duty of the State to provide care for its citizens who are 'feeble-minded and are, therefore, unable properly to take care of themselves'."

That Court, at page 738, note 25, 92 S. Ct. 1845, suggested that Jackson or the State might seek his commitment under the statute for commitment of the feeble-minded. The opinion suggests that the feeble-minded are not dangerous and might even be able to care for themselves under certain circumstances. The Court in that case specifically states that:

"The bases that have been articulated (for involuntary civil commitments) include dangerousness to self, dangerousness to others, and the need for *care*[6], *or* treatment *or* training." Jackson v. Indiana, supra, at page 737, 92 S.Ct. at page 1857. (emphasis added)

To my mind, the Supreme Court gives no indication that one who, because of insanity is in need of care which is otherwise unavailable, may not be constitutionally committed for that purpose.

I, therefore, suggest that the State's interests which may constitutionally be protected by infringing on the insane person's right not to be deprived of his freedom, include, in addition to dangerousness and the need for treatment, the need for care and the need for training.

As pointed out heretofore and in the majority opinion, there is language in Jackson v. Indiana, supra, at page 728, 92 S.Ct. at page 1853, indicating that the Court construed a statute authorizing commitment of a person "in the interest of the welfare of such person or \* \* \* others \* \* \*", to require an independent showing of dangerousness. That observation appears to me to have been limited to the particular facts of that case and the application of the statute involved to those facts.[7] As herein otherwise demonstrated, the Court implicitly recognized that, under a different statute, a feeble-minded person might be committed independent of dangerousness so as to serve the State's

---

6. The Court of Appeals for the Fifth Circuit in Wyatt v. Aderholt, 503 F.2d 1305, No. 74–2634 (5th Cir. 1974), rejected the Governor's claim that the need for the care of an insane person is a valid basis for commitment in the Fifth Circuit. That rejection appears to be dicta as to the constitutional question since the Alabama statute, Title 45, § 205, requires both care and treatment.

7. In that case, Jackson was a mentally deficient deaf mute charged with a crime. He was found by the Court to be lacking in "comprehension sufficient to make his defense", and he was ordered by the Court to be committed to the Indiana Department of Mental Health until such time as that de-

partment should certify to the Court that the defendant is sane. The doctors testified that it was extremely unlikely that Jackson could ever learn to even communicate with others and that his "prognosis appears rather dim". The Supreme Court's determination that the statute authorizing commitment of Jackson "in the interest of the welfare of such person or \* \* \* others \* \* \*," requires an independent showing of dangerousness simply implied that the statute required a showing of danger to the welfare of such persons. The Court did not say or imply that there might not be some constitutionally valid reason for holding Jackson other than dangerousness.

"parens patriae" interest in caring for those unable to care for themselves.

I believe that the majority are misled by the language in Donaldson v. O'Connor, supra, as follows:

> "In summary, we hold that where a nondangerous patient is involuntarily civilly committed to a state mental hospital, the only constitutionally permissible purpose of confinement is to provide treatment, and that such a patient has a constitutional right to such treatment as will help him to be cured or to improve his mental condition."

That language, without more, would certainly indicate that involuntary civil commitment is constitutionally limited to dangerous patients or patients committed for their treatment; however, that language must be considered in the light of the language of the commitment statute, the facts of the case wherein the observation was made, and the prior language of the same Court in the same case at page 522 of 493 F.2d in explaining the necessity for the showing of a governmental interest superior to the right of the defendant not to be confined. After discussion of the necessary requirements for a criminal commitment, the Court stated that:

> "There must be a quid pro quo extended by the government to justify confinement. And the quid pro quo most commonly recognized is the provision of rehabilitative treatment, *or where rehabilitation is impossible, minimally adequate habilitation and care,* beyond the subsistence level custodial care that would be provided in a penitentiary." (emphasis added)

By the emphasized clause, the Court demonstrated its approval of the language in Jackson v. Indiana, supra, recognizing the State's duty to provide care for its citizens unable to care for themselves. It must be remembered that the facts under which Donaldson was committed were that the "committing judge told Donaldson that he was being sent to the hospital for 'a few weeks' to 'take some of this new medication'", and that he was certain that Donaldson would be all right and would come back soon. That statement, indicating a temporary commitment for treatment, was made at the commitment hearing in 1957, and Donaldson was finally released in 1971 after having brought a suit seeking his release from what the trial judge had articulated 14 years theretofore as a temporary commitment for treatment. It was clear that Donaldson was committed for the purpose of treatment, and though he refused certain treatment because of religious beliefs, the jury decided that he was denied other treatment available for his problems. Under those facts, the language of the Fifth Circuit to the effect that the "only constitutionally permissible purpose of confinement" was "to provide treatment", was accurate if confined to the facts of that case. If intended to apply to cases in general, it was dicta and not binding on this Court.

The federal statutes for commitment of insane persons which have been approved in Greenwood v. United States, supra, and implicitly in Jackson v. Indiana, supra, at page 731 et seq., do not necessarily involve a finding of dangerousness or necessity for treatment. The Court in *Jackson* recognizes a rule of reasonableness (406 U.S. at page 733, 92 S.Ct. 1845) to the effect that the terms of any such commitments are limited to a reasonable time to effect the purpose for which the defendant was committed and, if he were committed for the purpose of observation to determine his capacity to stand trial and if it appears after reasonable observation that he will not attain competency, he must be released from his commitment under § 4247 but, if he is then a dangerous insane person, he may be recommitted to effect the government's purpose of protecting its property and employees from dangerous insane people. If he is committed because he is dangerous and for some reason he ceases to be dangerous, his commitment may last no longer than the government's interest which was protected by the commitment. The com-

mitment (the deprival of liberty) is without constitutional authority when the governmental purpose for the commitment is no longer in existence. As stated in Jackson v. Indiana, supra, at page 738, 92 S.Ct. at page 1858:

"At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."

STANDARD OF PROOF: While I have no disagreement with the majority's decision as to the requisite standard of proof, I question that the Constitution requires any particular standard of proof for commitment even in criminal cases. This, in my opinion, should be a legislative decision. I, therefore, dissent therefrom.

SELF–INCRIMINATION: I have questions that the proposed opinion is not sufficiently clear about the extent of the applicability of the privilege against self-incrimination [8] in this type proceeding. The mentally ill person, unlike a criminal, must be judged to some extent from opinions of experts rather than from statements of eye witnesses. Therefore, the privilege should not be construed to avoid psychiatric examination entirely. While I think the privilege is obviously available to the subject to the extent that any evidence that he might give to the doctor which might conceivably incriminate him would be inadmissible in any trial against him, I believe that it should be made plain that the privilege should be restricted to matters concerned with criminal activity, and the subject should not be allowed to refuse on the ground of the Fifth Amendment privilege to submit himself for a psychological examination to determine, not his criminality but, his sanity.

CLASS ACTION: I dissent from that part of the opinion, Section II, holding that the named Plaintiffs fairly and adequately protect the interests of the class. I think we should confine our opinion to the named Plaintiffs and deny class action status.[9] There is, in my mind, a real question whether the ultimate objective sought in this case (the release of all patients) fairly represents the best interests or even the desires of each member of the class that the nominal Plaintiffs purport to represent. This Court should judicially know that in the class of Plaintiffs are hundreds of people who have no interest whatsoever in being released from the State mental institution and whose welfare demands that they be incarcerated somewhere. While there may be equal numbers who do have an interest in being released, the Plaintiffs may be more interested in technical rights than in the interests of all members of their class. While I am convinced that the original Plaintiff, Jean P. Lynch, and the Intervening Plaintiff, Jesse M. Hughes, are entitled to a declaration of their rights (release or recommitment under a constitutional process), this Court may do

---

8. Amendment 5. " * * * nor shall be compelled in any criminal case to be a witness against himself, * * *."

9. In Wyatt v. Aderholt, supra, 503 F.2d at 1316, a somewhat similar case, the Court of Appeals, in determining a class action appropriate, reasoned as follows: "Here the plaintiffs seek preventive relief, to assure in advance that mental patients will at least have the *chance* to receive adequate treatment by proscribing the maintenance of conditions that foredoom *all* mental patients *inevitably* to inadequate mental treatment. Moreover, there are special reasons why reliance upon individual suits by mental patients would be especially inappropriate. Mental patients are particularly unlikely to be aware of their legal rights. They are likely to have especially limited access to legal assistance. Individual suits may be protracted and expensive, and individual mental patients may therefore be deterred from bringing them. And individual suits may produce distortive therapeutic effects within an institution, since a staff may tend to give especially good—or especially harsh—treatment to patients the staff expects or knows to be litigious." However, that case sought establishment of a program for all consistent with the well-being of, and "brought on behalf of all patients". This suit seeks immediate release of each patient, without regard for or consideration of their continued well-being after release.

an injustice to hundreds of other persons committed in Alabama mental institutions by ordering their release or recommitment on a hearing without any real notice that their ouster is being considered. Conceivably, many of these people have no one who is interested in them at this point. It is doubtful that the probate judges and other State officials throughout the State could be counted on to search out and reinstitute commitment proceedings against all those people deserving commitment. Many of them are conceivably far happier, and their welfare far better provided, where they now are. Some of them know no homes and could find no homes other than in Alabama mental institutions.

A judgment of any Court is, under principles of comity and federalism, entitled to full faith and credit [10] by this Court until such time as a party to that judgment in an adversary proceeding shall attack such a judgment and have it duly set aside in this or some other court. If each member of the class were so represented and his interests were really seriously litigated in this Court, I should feel that his commitment, if shown to be unconstitutional, should be set aside. However, until the interest of each is seriously represented in this Court with legal notice to each,[11] I do not feel that we should set aside all of the commitments to Alabama's mental

institutions. I would confine a judgment and order in this case to the cases of Lynch and Hughes, who have real notice of this cause of action, with process or otherwise.

The representative parties Plaintiff, in my opinion, do not, within the meaning of Federal Rules of Civil Procedure, Rule 23(a)(4), "fairly and adequately protect the interests of the class". In my judgment, this is not a proper class action.

---

10. The mischief associated with allowing disinterested persons to nullify judgments for and against parties to a long-determined legal proceeding has long been recognized by the courts. Many good reasons, in addition to the preferences of both parties and the necessity that controversy be finally put to rest, may exist for not setting aside a judgment. The person ordinarily entitled to vacate a judgment is the party wronged thereby. Harter Twp. v. Kernochan, 103 U.S. 562, 26 L.Ed. 411. An irregularity, in order to afford ground for relief from a judgment, must be prejudicial to the applicant for such relief. Ring Refrigerator & Ice Mach. Co. v. St. Louis Ice Mfg. & Cold Storage Co., 8 Cir., 67 F. 535. One who accepts and retains the fruits of a judgment may be estopped from denying its validity. Compton v. Jesup, 167 U.S. 1, 17 S.Ct. 795, 42 L.Ed.

55; McKee v. Hassebroek, (C.A.10 Okl.) 337 F.2d 310; Livesay Industries, Inc. v. Livesay Window Co., (CA5 Fla.) 202 F.2d 378. It is usually held that the validity and correctness of a judgment are rebuttably presumed. Thompson v. Thompson, 91 Ala. 591, 8 So. 419; Todd v. Flournoy, 56 Ala. 99; Evers v. Watson, 156 U.S. 527, 39 L.Ed. 520, 15 S.Ct. 430. Jurisdiction is usually presumed until the contrary appears. Milliken v. Meyer, 311 U.S. 457, 61 S.Ct. 339, 85 L.Ed. 278, reh. den. 312 U.S. 712, 61 S.Ct. 548, 85 L.Ed. 1143.

11. Notice procedure in class actions must assure fair and full consideration of all claims and adequate protection of those persons not present but bound by the judgment. Eisen v. Carlisle and Jackquelyn, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732.